### C. E. WILKINS v. VASS COTTON MILLS.

(Filed 18 September, 1918.)

**1. Contracts—Offer to Buy—Acceptance of Offer.**

An acceptance of an offer must be in accordance with its terms, without substantial change therefrom, either by word or act, for it to show the agreement of the minds of the contracting parties thereon and become a binding contract.

**2. Same—Additional Offer—Rejection.**

An offer by telephone to buy 10,000 pounds of 20's and 24's cotton yarns of specified kind, according to specifications of an existing contract, with

weekly shipments to commence thereafter, replied to by telegram, "For immediate acceptance can furnish your order at half-cent advance over other order cotton higher," which in turn was replied to, "Telegram, accept offer make it twenty-five thousand if can make sixteens and eighteens, wire immediately," and followed by telegrams to original offerer, "Cannot increase order we do not make number below twenty": *Held*, the words of the second telegram, "accept offer," was a binding acceptance of the proposition to sell 10,000 pounds of the yarns specified at an advance of half of a cent, and not affected by the rejected proposition to increase the amount to 25,000 pounds upon the condition named.

**3. Contracts—Offers to Buy—Acceptance—Telegrams—Punctuation.**

Where an offer to sell has been made and accepted by telegrams, and, though not punctuated, the messages are so worded that they were fully understood by the parties, the absence of punctuation therein is immaterial.

**4. Contracts—Telegrams—Telephones—Confirmation.**

Where it is customary to follow offers to buy, and acceptances of such, made by telephone and telegraph, with confirmatory letters, for the purpose only of making more certain the terms of the resulting contract, and an acceptance of such an offer has been unconditionally made in full accordance with its terms, the failure of the parties to send such letters will not alter the binding effect of the contract.

**5. Contracts—Offers to Buy—Acceptance—Telegrams—"Wire Immediately."**

Where an offer for the sale of cotton yarns has been made by telegram for immediate acceptance, and immediate reply of acceptance has been sent by telegraph, with a proposition to increase the order in yarns of certain other sizes, "wire immediately," which was rejected, the words, "wire immediately," refer to the new and independent offer to buy, and does not affect the binding force of the accepted offer to sell.

ACTION tried before *Whedbee, J.,* and a jury, at April Term, 1918, of WAYNE.

Judgment of nonsuit upon the evidence, and plaintiff appealed.

This action was brought to recover damages for a breach of contract to sell and deliver cotton yarns to the plaintiff. The nature of the case will appear from the testimony of the plaintiff and other brief excerpts from the record. Plaintiff testified: "I live in Goldsboro, N. C., and have had dealings with the Vass Cotton Mills Company. On 16 October, 1916, I received an inquiry from one of my customers, the Drexel Knitting Mills, at Drexel, N. C. I thereupon, on the same date (16 October, 1916), called up Vass Cotton Mills Company over the long-distance telephone, and talked with Mr. Graham, who is secretary and treasurer of the Vass Cotton Mills, and with whom I had dealt before. I told Mr. Graham that I wanted 10,000 pounds of 20's and 24's, of the same specifications and shipping instructions, and same weekly shipments as under the present contract, which we had at that time, and to begin at the expiration of that contract. He stated that he was not able

to quote at that time; that he had to see about getting cotton, and that he would wire me the next day. On the next day, which was 17 October, 1916, I received a telegram in reply to the inquiry by long-distance telephone of the day before, as follows:

VASS N C October 17th 1916

C E WILKINS *Goldsboro N C*

For immediate acceptance can furnish your order at half-cent advance over other order cotton higher

(Signed)   VASS COTTON MILLS

(This telegram was written in capitals, without any punctuation, when received by plaintiff.)

"At that time I had a contract with the defendant, under which it was then delivering at the price of 33½ cents per pound. The original of this contract is in the possession of the defendant. This made the price of yarns of the first contract 34½ cents per pound, basis 20's. The price of the second contract was therefore 35 cents per pound, basis 20's. Upon receipt of this telegram I immediately delivered the following telegram to the Western Union Telegraph Company for transmission to defendant:

GOLDSBORO, N. C., October 17th, 1916.

VASS COTTON MILLS, *Vass, N. C.*

Telegram. Accept offer. Make it twenty-five thousand if can make sixteens and eighteens. Wire immediately.

.(Signed)   C. E. WILKINS.

(When received by the defendant, this telegram was written in capitals, without punctuation, though it was in the exact form as above set forth when delivered by plaintiff to the telegraph company.)

"To this telegram I received the following by wire:

VASS N C 5 p m October 17th 1916.

C E WILKINS *Goldsboro N ·C*

Cannot increase order we do not make numbers below twenty

(Signed)   VASS COTTON MILLS

5:24 p m

"In my conversation over the phone with Mr. Graham on 16 October, 1916, I had asked him for a price on 10,000 pounds of 20's and 24's to follow present contract, at the same rate of present contract, to be shipped to the same customer. My recollection is, that the contract which I refer to as 'present contract' expired about the first week in

December, 1916. At the expiration of that, the defendant did not ship any yarns on the second contract. I requested them to make shipments, but they did not do so. I first wrote, requesting them to make shipments on this second contract on 19 December, 1916. I did not get a reply to that letter, so I wrote them again on 29 December, in reply to which I received the following telegram:

VASS N·C 3:25 p m December 30th 1916.

MR C E WILKINS *Goldsboro N C*

Letter 29th have only one order which is completed can furnish amount Hetrich forty-four cents.

(Signed)     VASS COTTON MILLS

4:09 p m

"This was the first notice I had from them that they did not intend to ship on this second contract. The market price for yarns of the character referred to in this contract, on 30 December, 1916, was 43 cents per pound, basis 20's. Upon receipt of this telegram, I took the matter up with them by phone and also wrote them."

There was evidence of a custom to follow up orders by telegram or telephone, with a letter of confirmation to prevent errors in transmission, and when such confirmation was not forthcoming the manufacturer called for it, at his option. Plaintiff, in regard to this custom, testified: "It is a fact that both by telephone and telegraph errors frequently creep in. It is my custom, after transactions by telephone or telegraph, to send letters of confirmation. I did not do this in this instance. It is not a fact that the price of yarns is regulated by the price of cotton. This is not the only order that I had with the Vass Cotton Mill Company in which I failed to send formal order with specific instructions. There is one time I didn't send it until they called my attention to it. I didn't send it with the contract, and they asked me to send a formal order, and I did so. As a matter of fact, I did send specific orders, or formal orders, in each of the other instances. . . . The 2,500 pounds I bought from them was to cover part of this 10,000 pounds which I had contracted for (and which defendant refused to ship). In the one instance, besides this, in which I failed to send what they called confirmation, the company requested it, and I did send it at their request. This is the invariable custom of companies manufacturing yarns. There is no controversy about the first contract. I wish to explain what I said about the price of yarns being regulated by the price of cotton. Of course, it is, primarily, but there are cases in which the price of cotton would advance more, but it doesn't necessarily follow that the price of yarn advances, and this case was one of them. We have a case today,.

cotton being broken 5 cents, and the spinners asking the same for yarn as they did before cotton broke. I am also a spinner." . . .

There was no testimony for the plaintiff but his own, just recited. The court refused a nonsuit at the close of plaintiff's testimony.

Defendant introduced in evidence the telegram from plaintiff to defendant, dated 17 October, 1916, in reply to defendant's message of that date to him, as set forth above.

The court thereupon nonsuited the plaintiff, and he appealed.

There is this stipulation between the parties in the record:

"It is admitted in this case that the difference in the value of the yarn on 17 October, the date of the alleged order, and on 30 December, the date that the defendant notified plaintiff that he did not consider it a contract and refused to fill the order, was 8 cents, and that if the plaintiff was entitled to recover anything in this action, to wit, if there was a valid and binding contract, that he is entitled to recover $800. . . . It is further agreed, if the Supreme Court holds upon the evidence as a matter of law, that there was a contract, that this case need not hereafter be tried, but that judgment shall be entered against the defendant for the sum of $800." ·

*D. H. Bland and Teague & Dees for plaintiff.*
*W. F. Taylor and R. L. Burns for defendant.*

WALKER, J. There cannot be a contract unless there is agreement of minds, and an offer can become a binding promise and result in a contract only when it has been accepted, according to its terms, and without substantial change, either by word or act, for without such an acceptance there cannot be agreement, which is an essential element and consists in the parties being of the same mind and intention concerning the subject-matter of the contract. 9 Cyc., 244, 254. In this case the evidence, which we must consider as true in dealing with a nonsuit, shows a definite offer to sell cotton yarns, manufactured by the defendant at its mill, of a certain quality or grade, designated by numbers, and for a certain or fixed price. This offer was well understood by the parties, who had been in communication before in regard to it by the use of the telephone. There is no dispute, though, as to what were the terms and meaning of the offer, the controversy being restricted to the meaning of the telegram of acceptance. We are of the opinion that there should be no difficulty in determining this question. The acceptance is so plain and simple in its wording that the meaning cannot be misunderstood, and this is true without regard to its lack of punctuation. It informed the defendant that its telegram had been received, and that its offer was accepted. The defendant's message, when received by the plaintiff, disclosed the terms

of a definite and distinct offer to sell the yarns at a certain price, and the words, "Accept offer," could convey but one meaning, which is, that the offer was accepted as it had been made by the defendant. And it was an absolute acceptance, without any condition or qualification. What follows the acceptance are not words of condition or qualification, and was not intended to vary the terms of the offer. The bargain to take the 10,000 pounds of 20's and 24's at the price named in the offer was defendant could furnish yarns known as 16's and 18's, and was entirely to the defendant. The remaining words were intended, not to change this contract, but to make a new and additional offer by the plaintiff to defendant as to increasing the quality to 25,000 pounds in the event defendant could furnish yarns known as 16's and 18's, and was entirely independent of the acceptance of the offer. This, we think, is clear, and it makes no difference in the conclusion whether we read plaintiff's telegram of 17 October, 1916, in reply to the one from the defendant, with or without punctuation, for the language, when naturally construed, divides the message of the plaintiff into three distinct sentences—the first, as to the receipt of the plaintiff's telegram; the second, as to the acceptance of the offer; and the third, as to the increase in quantity. But, viewing the words in another way, we reach the same conclusion, for if we take the meaning to be that the plaintiff accepted the offer, unless the defendant could furnish 16's and 18's, when the quantity could be increased to 25,000 pounds, now as this could not be done, it left the accepted offer intact. But the language is not as strong as this, and, as we find it, admits of but one construction. The defendant so understood the true meaning of the telegram, as appears from its own interpretation of it. In its telegram in reply it says: "Cannot increase *order,* as we do not make numbers below 20." This means, without doubt, that defendant treated the acceptance as forming an independent contract, and that what followed was a new offer by the plaintiff for more yarns of a different kind.

That the last words do not qualify the acceptance of the offer, so as to contravene the rule that it must be in accordance with the terms of the order, is well settled by the highest authority. "If an offer is accepted as made, the acceptance is not conditional and does not vary from the offer, because of inquiries whether the offerer will change his terms, or as to future acts, or the expression of a hope, or suggestion," etc. 9 Cyc., 269, citing authorities. "An inquiry as to whether the offerer will modify the terms of the offer is not a rejection; or if, after acceptance, the acceptor insists on a modification of the original contract, in which the offerer does not acquiesce, such insistence cannot avoid the contract. Hence the acceptor can subsequently enforce the original contract in the absence of facts to create an estoppel." 1 Paige on Contracts (1905),

sec. 46, p. 80.  The following, taken from a decided case, is closely applicable: "The guardian's acceptance of the defendant's offer was absolute and unconditional.  It is not in any legal sense qualified by the expression of his hopes as to what the defendant would have done, or what he would like to have him do if the hay when hauled proved good enough. Aside from all this, the defendant was told that he could take the hay at his own offer.  It seems to have been the intention and understanding of both parties that the property should pass."  *Phillips, by his guardian, v. Moor,* 71 Me., 78.  In *Gulton v. Gilchrist,* 92 Iowa, 718, where defendant accepted the offer of a lease for five years at $200 per year, adding that he would like to build a cookroom, with privilege to remove it, it was held that the offer had been accepted absolutely, and the reference to the cookroom did not vary the terms of the offer.  The Court, in *Brown v. Cairns,* 63 Kansas, 693, ruled the same way in respect to a contract of lease similarly worded, holding that the additional words as to a reduction of the rent did not have the legal effect of making the acceptance of the offer conditional.  The case of *Stevenson v. McLean,* 5 L. R., Q. B. Div. (1879-'80), p. 346, is, in principle, much, like our case, but it will be found upon examination of the above case that there is less reason here for holding that the words added to the plaintiff's acceptance of the defendant's offer either constituted a rejection of it or made it conditional, than there was in the cases just cited by us, for in this instance there was an absolute acceptance of the defendant's offer and a new offer by plaintiff as to other yarns. ·

It is said in 6 Ruling Cas. Law, p. 605, par. 27: "A request, suggestion, or proposal of alteration or modification, made after an unconditional acceptance of an offer, and not assented to by the opposite party, does not affect the contract in force and effect by the acceptance."  But the case of *Turner v. McCormick,* 56 W. Va., 161 (107 A. S. Rep., 904; 67 L. R. A., 853), is more directly in point, and in the opinion of the Court, by *Judge Poffenbarger,* there is an able and exhaustive treatment of the subject, with full citation and review of the cases bearing upon it. The Court there held:

"1.  An acceptance in writing of a formal and carefully prepared option of sale of land, within the time allowed by it for acceptance, using the formal words, 'according to terms of the option given me,' to which there is added, by the conjunction 'and,' a request for a departure from its terms as to the time and place of performance, is unconditional, and converts the option into an executory contract of sale.

"2.  A mere request by one of the parties thereto for an alteration or modification of a fully accepted proposed contract, which by acceptance has been wrought into a binding contract, is not a breach thereof, giving right of rescission thereof or action thereon.  Neither does it effect such alteration, unless assented to by the other party.

"3. Such request relates to performance of the contract, and is not an element in the making thereof, although written and connected as aforesaid, with the acceptance, on a single sheet of paper, so as to make of the acceptance and request a compound sentence."

In discussing the question whether there is any difference in legal effect between a new proposal, if contained in the paper accepting the offer, which is our case, and one if in a separate writing, the learned judge said: "A request may be added to an acceptance for a good purpose, and it does not necessarily indicate an intention to change the terms of the proposed contract. The plaintiff desired the land, and was willing to take it and pay for it. He preferred to close all the options on the same day, and therefore added this request. Suppose he had on one day put the first part of the notice in writing and sent it to the defendant. That would have closed the contract, undoubtedly. Then suppose, on the next day he had written a request that the performance be delayed until 28 June. That would not have been a repudiation of the contract. It would have been a mere request for an extension of time. The defendant could not have treated the contract as broken for that reason. He could have enforced it, notwithstanding this request. The mere fact that the acceptance and the request are in juxtaposition, standing in the same sentence, united by a conjunction, does not change their character or legal sense." We repeat that the facts in this case are stronger in favor of the plaintiff than were those in the cases cited in favor of the party who accepted the offer, for the language here clearly imports an intention to accept absolutely, and, in addition and without any alteration of the acceptance in the least, to make another offer or proposal to buy other yarns, and the defendant so regarded it, as in his last message he refers to the acceptance as constituting an order for the 10,000 pounds of yarns.

The second position of the defendant is equally untenable. If there is sufficient evidence to show a custom to follow up the telegraphic acceptance with a confirmatory letter, it was intended, of course, merely as a precautionary measure to provide against a possible mistake in transmission by the electric telegraph. We do not understand the evidence to be as the defendant construes it. When the plaintiff testified that "This is the invariable custom of companies manufacturing yarns," which immediately follows his allusion to the one instance where he failed to mail such a letter, when the defendant requested such a letter and it was sent at its request, he was evidently referring to the custom of the defendant, when there had been such an omission on the part of its customer, to call attention to it and request that the letter be sent. If he had been referring to a custom of the customer to follow the acceptance with a confirmatory letter, he would not have used the words,

the "custom of companies." This, we think, is the natural and reasonable construction as the record now stands. There may have been ellipses, but this does not appear. "If the acceptance is complete, a request that a formal contract be drawn up embodying the terms of the agreement is immaterial." 9 Cyc., 291. The object of such a custom, if it existed, was to avoid any mistake in the terms of the contract, and not for the purpose of finally settling the terms by a formal writing. This is the clear distinction as we understand it. 9 Cyc., 280. In the case at bar the terms of the contract are not the subject of dispute, but only their meaning.

A similar question was presented recently in *Billings v. Wilby,* 175 N. C., 571, where the parties had been negotiating about a contract, and finally agreed on the terms, but plaintiff wired his acceptance, as follows: "Night letter received. Will accept. Send contract signed at once." And it was held that the words, "Send contract signed at once," did not prevent the completion of the contract by the formal acceptance in the same message. *Justice Hoke* said, when referring to the final words of the message of acceptance: "This, by correct interpretation, meaning merely that it was the desire and preference of the plaintiff that the agreement they had made should be written out and formally signed by the parties, and it is the recognized position here and elsewhere that, when the parties have entered into a valid and binding agreement, the contract will not be avoided because of their intent and purpose to have the same more formally drawn up and executed, and which purpose was not carried out," citing *Gooding v. Moore,* 150 N. C., 195; *Teal v. Templeton,* 149 N. C., 32; *Sanders v. Pottlizer Bros. Trust Co.,* 144 N. Y., 209; Clark on Contracts (2 Ed.), 29, and authorities cited. But the principle is stated with more direct reference to the facts of our case in *Gooding v. Moore, supra,* where we held: "When the parties to an oral contract contemplate a subsequent reducing it to writing, as a matter of convenience and prudence and not as a condition precedent, it is binding upon them, though their intent to formally express the agreement in writing was never effectuated."

Our conclusion is that the case falls easily within the principle stated in the books regarding the legal effect of such transaction, viz.: "The acceptance of an offer must be absolute and identical with the terms of the offer; or, as it has been expressed, 'an acceptance, to be good, must in every respect meet and correspond with the offer, neither falling within nor going beyond the terms proposed, but exactly meeting them at all points and closing with them just as they stand. Unless this is so, there is no meeting of minds and expression of one and the same common intention—the intention expressed by one of the parties is either doubtful in itself or is different from that of the other. The intention

of the parties must be distinct and common to both.'" Clark on Contracts (2 Ed.), pp. 27 and 28. "An acceptance by promise or act, and communication thereof when necessary, while an offer of a promise is in force, changes the character of the offer. It supplies the elements of agreement and consideration, changing the offer into a binding promise, and the offer cannot afterwards be revoked without the acceptor's consent. Where the agreement is complete by acceptance, a new proposal to modify it by either party has no effect on the agreement unless it is accepted and thus becomes a new substituted agreement." 9 Cyc., pp. 283, 284.

The correspondence took place about the middle of October, 1916, and defendant complains that the plaintiff did not insist upon performance of the contract to deliver 10,000 pounds, nor refer to the matter after its last message until 1 December, 1916; but in this connection it appears that a contract for yarns was then pending between the parties and in the course of performance, and the new contract was not to be performed until the completion of the deliveries under the pending agreement, which took place the first of December, when plaintiff called for the deliveries under the contract of October. This fully explains the delay, and further manifests plaintiff's clear understanding of the agreement. It may further be said that plaintiff wrote to the defendant about the first and on 16 December, asking for the shipment of the yarns, and received no reply to either letter, and received none at all until his third letter was mailed the last of the month. Why the defendant was thus silent is not explained by the evidence, though the market price of cotton was rising all the time, as it appears. It is strange that defendant said nothing when urged to fill the contract, if it was not liable on the contract. The natural impulse would have been to deny at once that the contract was ever made.

This expression in plaintiff's telegram of 17 October, 1916, "Wire immediately," referred clearly to his new and independent offer to buy more yarns of a different number, if defendant had them for sale.

The contract was clearly expressed, and was consummated by the acceptance of plaintiff, and not affected by the new proposal, which was added to it.

Judgment will therefore be entered below for the plaintiff according to the stipulation of the parties appearing in the record, unless there is meanwhile an adjustment between them as to debt and costs.

Reversed.