CHARLES RAY BILLINGS, Employee, Plaintiff v. GENERAL PARTS, INC., Employer, ZURICH AMERICAN, Carrier, GAB ROBINS, Administering Agent, Defendants

No. COA07-318

(Filed 18 December 2007)

1. **Workers' Compensation— injury by accident arising out of employment—motor vehicle accident—increased risk analysis**

The Industrial Commission did not err in a workers' compensation case by concluding that plaintiff's 2 June 2003 motor vehicle accident arose out of his employment with defendant employer when plaintiff had a blackout while he was returning to his employer's place of business after making a delivery in the employer's pickup truck, because: (1) an injury arises out of employment if an idiopathic condition of the employee combines with risks attributable to the employment to cause the injury; (2) when an employee's duties require him to travel, the hazards of the journey are risks of the employment; (3) the increased risk analysis was not relevant in this case when it is used primarily where an employee interrupts his work for his employer to engage in personal conduct unrelated to the employer's business; and (4) contrary to defendants' inference, our State's acceptance of the increased risk doctrine does not preclude the Commission from relying on *Allred*, 253 N.C. 554 (1960), in its conclusions of law.

**2. Workers' Compensation— motor vehicle accident—initial head injury and later subdural hematoma**

The Industrial Commission did not err in a workers' compensation case by concluding that plaintiff employee's initial head injury and later subdural hematoma were the result of the 2 June 2003 motor vehicle accident based on plaintiff's medical records and the testimony of treating physicians.

**3. Workers' Compensation— medical disability—arising out of and in course of employment**

The Industrial Commission did not err in a workers' compensation case by determining that plaintiff's second stroke and resulting medical disability were the result of the 2 June 2003 motor vehicle accident, because (1) a doctor testified and the Commission found that although plaintiff's initial recovery went well, plaintiff's subdural hematomas, resulting medical problems, functional deterioration, and disability were all related to the 2 June 2003 accident; and (2) there was sufficient evidence to support this finding.

Appeal by employer from Opinion and Award entered 24 October 2006 by the North Carolina Industrial Commission. Heard in the Court of Appeals 18 September 2007.

*Wilson and Reives, PLLC, by E. Neil Morris, for plaintiff-appellee.*

*Brooks Stevens & Pope, P.A., by Michael C. Sigmon, for defendants-appellants.*

MARTIN, Chief Judge.

General Parts, Inc., d/b/a Carquest of Sanford ("defendant-employer"), Zurich American, and GAB Robins (collectively "defendants") appeal an Opinion and Award by the North Carolina Industrial Commission ("Commission") awarding benefits to employee Charles Ray Billings ("plaintiff"). We affirm.

The record reflects that plaintiff was engaged in an employment relationship with defendant-employer on 2 June 2003 as a part-time automotive parts delivery truck driver. The seventy-three-year-old plaintiff had been employed with defendant-employer in this capacity for six years. On that date, plaintiff was returning to defendant-employer's place of business after making a delivery in defendant-

employer's pickup truck. Plaintiff suffered a blackout while operating the truck, ran off the street near a railroad crossing, and struck a light pole, causing the truck to roll over. At the scene, plaintiff was conscious and alert, but complained of head pain. Plaintiff was transported to Central Carolina Hospital ("CCH") where he underwent a CT scan of his head on the same day.

The CT scan noted a "[s]mall focus of increased attenuation identified adjacent to the superior sylvian fissu[r]e which may possibly represent a [cerebral] contusion." On 4 June 2003, plaintiff underwent an MRI of the brain. The MRI noted an "acute punctate right cerebellar infarct" and noted there was neither subdural bleeding nor an acute contusion in the left parietal lobe, but could not exclude the presence of a small contusion. Plaintiff was discharged from CCH on 4 June 2003 with diagnoses of a syncopal episode (i.e., a sudden loss of consciousness) and an acute right cerebellar small lacunar infarct (i.e., a stroke).

After a follow-up appointment on 9 June 2003 with his primary care physician, certified internist Dr. Steven Michael, plaintiff was referred to certified neurologist and neurophysiologist Dr. Mohan C. Deochand for further evaluation. On 12 June 2003, Dr. Deochand saw plaintiff who complained of suffering from headaches for several days after his discharge from the hospital. Dr. Deochand diagnosed plaintiff with a right cerebellar infarct. On 16 June 2003, plaintiff returned to Dr. Deochand complaining of "more bleeding" from his nose.

On 22 July 2003, Dr. Michael saw plaintiff for a checkup. Plaintiff complained of episodes of right facial numbness. On 2 August 2003, Dr. Deochand saw plaintiff who complained of pain and weakness in his legs and difficulty walking. Plaintiff also complained of neck pain radiating into the right side of his head. On 5 August 2003, plaintiff arrived in a wheelchair to see Dr. Michael for complaints of headache with nausea and ongoing muscle weakness. Dr. Michael's neurological exam revealed a slight decrease in the strength of plaintiff's left upper and lower extremities.

On 7 August 2003 at 4:00 a.m., plaintiff was seen at the CCH Emergency Department complaining of a sharp, throbbing headache that woke him up. The following day, he was seen by Dr. Sangeeta Sawhney who admitted plaintiff to CCH's Intensive Care Unit due to complaints of severe headaches and new onset left-sided weakness. An MRI performed that afternoon showed that plaintiff had "obvious

bilateral subdural hematomas present"—i.e., bleeding in the subdural space of the brain—that were larger on the right than the left. The subdural hematomas appeared to be "subacute in nature but age [was] indeterminate." The MRI showed "no other sign of an infarct." Based on his critical condition, plaintiff was transported to Wake Medical Center ("Wake Med") for further treatment. A CT scan done later that evening showed bilateral subdural fluid collections present and noted a subsequent right to left hemispheric shift.

On 9 August 2003, neurosurgeon Dr. Russell Margraf performed a right frontal craniotomy for evacuation and drainage of "acute on subacute subdural hematoma." Dr. Margraf noted that a "considerable amount of dark clot and crank case oil fluid under pressure [was] evacuated" and a drain was sewn into place in plaintiff's head.

On 15 August 2003, a neurological consult was requested after an onset of uncontrolled violent movements in plaintiff's right lower extremities. Neurologist Dr. Susan A. Glenn noted that these movements were consistent with a right lower extremity hemiballismus which "may present a small new stroke, or possibl[e] sequela" of plaintiff's brain injury from the subdural hematomas. A 15 August 2003 MRI reported persistent bilateral subdural hematomas and "acute bilateral posterior cerebral artery territory infarctions" or strokes.

After plaintiff's condition continued to deteriorate, he was admitted and transferred to Wake Med Rehabilitation Hospital ("Wake Med Rehab") on 18 August 2003 for assistance with control of the hemiballismus of the right lower extremity. Plaintiff was noted to be lethargic, disoriented, and incapable of following simple directions. Plaintiff remained at Wake Med Rehab until his discharge and transfer on 5 September 2003 to Laurels of Chatham, a long-term care facility, due to his sharp decline and severe deficits in cognition and mobility. At the time of his discharge from Wake Med Rehab, plaintiff required assistance for feeding, grooming, toileting, and movement. Plaintiff's condition improved during his four-month stay at Laurels of Chatham to allow plaintiff to return home in December 2003, even though he continued to have problems with involuntary movement of his legs. Board certified family medicine specialist Dr. John Corey began treating plaintiff in Laurels of Chatham and continued to see plaintiff after he left the long-term care facility and returned home. Dr. Corey determined that plaintiff was unable to work due to his cognitive impairment and the movement disorders of his legs, and found

that plaintiff was completely and permanently disabled as a result of these medical problems.

On 31 October 2003, defendant-employer denied plaintiff's claim on the grounds that plaintiff's injuries were not the direct result of a work-related accident. After receiving evidence, a deputy commissioner filed an Opinion and Award which determined that plaintiff's injuries were the direct result of a work-related accident and ordered defendants to pay for all existing and future medical expenses incurred as a result of plaintiff's motor vehicle accident, as well as total disability benefits from the date of the accident until the Commission decided otherwise. Defendants appealed to the full Commission. On 24 October 2006, the Commission entered an Opinion and Award affirming the deputy commissioner's decision, with some modifications. This appeal follows.

---

Our Supreme Court has "repeatedly held 'that our Workers' Compensation Act should be liberally construed to effectuate its purpose to provide compensation for injured employees or their dependents, and its benefits should not be denied by a technical, narrow, and strict construction.'" *Adams v. AVX Corp.*, 349 N.C. 676, 680, 509 S.E.2d 411, 413 (1998) (quoting *Hollman v. City of Raleigh*, 273 N.C. 240, 252, 159 S.E.2d 874, 882 (1968)).

The Industrial Commission and the appellate courts have distinct responsibilities when reviewing workers' compensation claims. *See Deese v. Champion Int'l Corp.*, 352 N.C. 109, 114, 530 S.E.2d 549, 552 (2000). The Industrial Commission is "'the fact finding body,'" *Adams*, 349 N.C. at 680, 509 S.E.2d at 413 (quoting *Brewer v. Powers Trucking Co.*, 256 N.C. 175, 182, 123 S.E.2d 608, 613 (1962)), and is "'the sole judge of the credibility of the witnesses and the weight to be given their testimony.'" *Id.* (quoting *Anderson v. Lincoln Constr. Co.*, 265 N.C. 431, 433-34, 144 S.E.2d 272, 274 (1965)). On appeal, "'[t]he findings of fact by the Industrial Commission are conclusive . . . if supported by any competent evidence.'" *Id.* at 681, 509 S.E.2d at 414 (quoting *Gallimore v. Marilyn's Shoes*, 292 N.C. 399, 402, 233 S.E.2d 529, 531 (1977)). These findings "'are conclusive on appeal . . . *even though there be evidence that would support findings to the contrary.*'" *Id.* (quoting *Jones v. Myrtle Desk Co.*, 264 N.C. 401, 402, 141 S.E.2d 632, 633 (1965)) (emphasis added). "The evidence tending to support plaintiff's claim is to be viewed in the light most favorable to plaintiff, and plaintiff is entitled to the benefit of every reasonable inference to be drawn from the evidence." *Id.* (citing

*Doggett v. South Atl. Warehouse Co.*, 212 N.C. 599, 194 S.E. 111 (1937)). "An opinion and award of the Industrial Commission will only be disturbed upon the basis of a patent legal error." *Roberts v. Burlington Indus., Inc.*, 321 N.C. 350, 354, 364 S.E.2d 417, 420 (1988) (citing *Hoffman v. Truck Lines, Inc.*, 306 N.C. 502, 505, 293 S.E.2d 807, 809 (1982)). Therefore, this Court " 'does not have the right to weigh the evidence and decide the issue on the basis of its weight. Th[is] [C]ourt's duty goes no further than to determine whether the record contains any evidence tending to support the finding.' " *Adams*, 349 N.C. at 681, 509 S.E.2d at 414 (quoting *Anderson*, 265 N.C. at 434, 144 S.E.2d at 274). With these as our guiding principles, we now address defendants-appellants' assignments of error.

Defendants have asserted forty-eight assignments of error relating to three issues: (1) whether plaintiff's 2 June 2003 motor vehicle accident "arose out of" his employment with defendant-employer; (2) whether plaintiff's initial head injury and later subdural hematoma were the result of the 2 June 2003 motor vehicle accident; and (3) whether plaintiff's second stroke and resulting medical disability were the result of the 2 June 2003 motor vehicle accident. Defendants failed to present arguments addressing Assignments of Error 3 and 4 regarding Finding of Fact 4, as well as Assignments of Error 43 through 48 regarding Conclusions of Law 4, 5, 6, and the Commission's Award. These assignments of error are deemed abandoned. N.C.R. App. P. 28(a) (2007) ("Questions raised by assignments of error in appeals from trial tribunals but not then presented and discussed in a party's brief, are deemed abandoned.").

I.

[1] Defendants first contend the Industrial Commission erred when it concluded that plaintiff's 2 June 2003 motor vehicle accident arose out of his employment with defendant-employer. We disagree.

"In order to be compensable under the Act, an employee's injury by accident must arise out of and in the scope of employment." *Rackley v. Coastal Painting*, 153 N.C. App. 469, 472, 570 S.E.2d 121, 123 (2002). Our Supreme Court has held that "a determination that an injury arose out of and in the course of employment is a mixed question of law and fact, 'and where there is evidence to support the Commissioner's findings in this regard, [the appellate court is] bound by those findings.' " *Rose v. City of Rocky Mount*, 180 N.C. App. 392, 396, 637 S.E.2d 251, 254 (2006) (quoting *Barham v. Food World*, 300 N.C. 329, 331, 266 S.E.2d 676, 678 (1980)) (alteration in original).

" 'In the course of the employment' is construed to refer to the time, place and circumstances under which the accident occurs." *Warren v. City of Wilmington*, 43 N.C. App. 748, 750, 259 S.E.2d 786, 788 (1979) (citing *Hinkle v. Lexington*, 239 N.C. 105, 79 S.E.2d 220 (1953)). " 'Arising out of' the employment is construed to require that the injury be incurred because of a condition or risk created by the job." *Id.* In other words, "[t]he basic question [to answer when examining the arising out of requirement] is whether the employment was a contributing cause of the injury." *Roberts*, 321 N.C. at 355, 364 S.E.2d at 421 (citing *Allred v. Allred-Gardner, Inc.*, 253 N.C. 554, 557, 117 S.E.2d 476, 479 (1960)).

"It is well established in North Carolina that the Workers' Compensation Act should be liberally construed and that [w]here any reasonable relationship to employment exists, or employment is a contributory cause, th[is] [C]ourt is justified in upholding the award as arising out of employment." *Hollin v. Johnston Cty. Council on Aging*, 181 N.C. App. 77, 84, 639 S.E.2d 88, 93 (2007) (quoting *Kiger v. Bahnson Service Co.*, 260 N.C. 760, 762, 133 S.E.2d 702, 704 (1963)) (first alteration in original) (internal quotation marks omitted). The employment-related accident " 'need not be the sole causative force to render an injury compensable.' " *Holley v. ACTS, Inc.*, 357 N.C. 228, 231, 581 S.E.2d 750, 752 (2003) (quoting *Hansel v. Sherman Textiles*, 304 N.C. 44, 52, 283 S.E.2d 101, 106 (1981)).

Our appellate courts have stated that "[w]hen the employee's idiopathic condition is the sole cause of the injury, the injury does not arise out of the employment." *Mills v. City of New Bern*, 122 N.C. App. 283, 285, 468 S.E.2d 587, 589 (1996) (citing *Vause v. Vause Farm Equip. Co.*, 233 N.C. 88, 92-93, 63 S.E.2d 173, 176 (1951)). However, "[t]he injury *does arise out of* the employment if the idiopathic condition of the employee *combines with* 'risk[s] attributable to the employment' to cause the injury." *Id.* (quoting *Hollar v. Montclair Furniture Co.*, 48 N.C. App. 489, 496, 269 S.E.2d 667, 672 (1980)) (emphasis added) (second alteration in original). "[I]f the employment 'aggravate[s], accelerate[s], or combine[s] with the [employee's preexisting] disease or infirmity to produce' the injury, that injury arises out of the employment." *Id.* (fifth alteration in original). In other words, " 'where the accident and resultant injury arise out of *both* the idiopathic condition of the workman and hazards incident to the employment, the employer is liable. But not so where the idiopathic condition is the *sole cause* of the injury.' " *Vause*, 233 N.C. at 92-93, 63 S.E.2d at 176 (emphasis added).

**BILLINGS v. GENERAL PARTS, INC.**

[187 N.C. App. 580 (2007)]

"[W]hen an employee's duties require him to travel, the hazards of the journey are risks of the employment." *Roberts*, 321 N.C. at 359, 364 S.E.2d at 423 (citing *Hinkle v. Lexington*, 239 N.C. 105, 79 S.E.2d 220 (1953)). " '[A]n injury caused by a highway accident is compensable if the employee at the time of the accident is acting in the course of his employment and in the performance of some duty incident thereto.' " *Id.* (quoting *Hardy v. Small*, 246 N.C. 581, 585, 99 S.E.2d 862, 866 (1957)).

In the present case, the parties stipulated that the accident occurred "in the course of" plaintiff's employment with defendant-employer. The Commission found that plaintiff suffered a syncopal episode (i.e., blackout) while operating defendant-employer's truck, after which time the truck ran off the road, hit a light pole, and flipped over. Plaintiff was not "off-duty and engaged in a purely personal errand when the accident occurred." *Chavis v. TLC Home Health Care*, 172 N.C. App. 366, 385, 616 S.E.2d 403, 417 (2005) (Tyson, J. dissenting). Plaintiff did not get a warning of an approaching seizure and purposefully "pull[] the truck off the road, park[] it, and [lie] down on the seat in a place of apparent safety, with all of the ordinary dangers of his employment suspended and in repose." *Vause*, 233 N.C. at 98, 63 S.E.2d at 180. In this case, plaintiff was returning to defendant-employer's place of business after making a delivery in defendant-employer's pickup truck. The Commission concluded:

> The hazards or risks incidental to plaintiff's employment were a contributing proximate cause of plaintiff's accident and resulting injuries. The risk of driving a truck aggravated, accelerated, or combined with plaintiff's pre-existing condition to produce his injury. Thus, plaintiff's injuries arose out of and in the course of his employment, as they were the result of his June 2, 2003 work-related accident.

(Citations omitted.) The Commission's conclusion was supported by its findings of fact and correct as a matter of law.

In support of their contention that plaintiff's accident did not "arise out of" his employment, defendants alternatively argue that the Commission erroneously relied on *Allred v. Allred-Gardner, Inc.*, 253 N.C. 554, 117 S.E.2d 476 (1960), and argue that plaintiff's injury does not survive an "increased risk" analysis. Defendants contend that *Allred* relied on the "positional risk" analysis to support its conclusion that the plaintiff's injury was compensable as "arising out of" his employment—a doctrine now rejected by our courts and replaced by

the "increased risk" analysis. While "[w]e agree that the 'increased risk' test and not the 'positional risk' rule is the law of the State," we disagree with defendants' contention that the Commission erroneously applied the latter. *Rose*, 180 N.C. App. at 401, 637 S.E.2d at 257.

Our Supreme Court has relied on the "increased risk" analysis to "determine whether injuries arose out of the claimant's employment" primarily "where an employee interrupts his work for his employer to engage in personal conduct unrelated to the employer's business." *Dodson v. Dubose Steel, Inc.*, 159 N.C. App. 1, 13, 582 S.E.2d 389, 397 (2003) (Steelman, J., dissenting), *rev'd per curiam*, 358 N.C. 129, 591 S.E.2d 548 (2004) (for reasons stated in the concurring and dissenting opinion of Steelman, J.). Here, since plaintiff was returning to defendant-employer's place of business after making a delivery on behalf of defendant-employer in defendant-employer's pickup truck at the time of the accident, an increased risk analysis is not relevant.

We also disagree with defendants' inference that our State's acceptance of the increased risk doctrine precludes the Commission from relying on *Allred* in its conclusions of law. This Court has determined:

> In *Allred*, the claimant was driving a truck for work when he blacked out and hit a pole. The fact that the plaintiff blacked out due to an idiopathic condition and that he was driving a truck for work at the time was sufficient to support a finding that the accident arose out of claimant's employment. No findings were required that the claimant's injury was made more severe or caused solely by the fact that he was driving a truck.

*Rackley*, 153 N.C. App. at 474, 570 S.E.2d at 125 (citation omitted). We believe the facts of the present case are consistent with this interpretation of *Allred*. Therefore, we affirm the Commission's ruling that plaintiff's 2 June 2003 motor vehicle accident "arose out of" his employment with defendant-employer and find no error.

II.

[2] Defendants next contend that the Industrial Commission erred when it concluded that plaintiff's initial head injury and later subdural hematoma were the result of the 2 June 2003 motor vehicle accident. Again, we must disagree.

Viewed in the light most favorable to plaintiff, the evidence showed that the 2 June 2003 CT scan found the following: "There is

increased attenuation identified adjacent to the superior portion of the left sylvian fissure. This finding may possibly represent a cerebral contusion." The 4 June 2003 MRI brain imaging found, in part: "The head CT previously performed demonstrated a focus of increased attenuation in the left parietal lobe. A small contusion cannot be excluded." This MRI also found that there was "[n]o evidence of left parietal lobe contusion." Since both findings were included in the same MRI report, the Commission was correct to allow for the possibility that a small contusion existed. The Discharge Summary further noted that plaintiff was involved in a motor vehicle accident which "le[d] to closed head trauma with injuries sustained to the left side of his head and a left ear laceration."

Additionally, during his 3 June 2003 examination of plaintiff at CCH, neurologist and neurophysiologist Dr. Deochand testified that plaintiff had "a scalp tenderness over the left temporal parietal region"—a finding that he testified was "significant." He also testified that the 4 June 2003 MRI "could not exclude any contusion over the left parietal region."

Neurosurgeon Dr. Margraf testified, "I think if the CAT scan suggested a small contusion, it's possible that there very well could have been a small contusion there. And the best way to follow that up would be with another CAT scan, not with a[n] MRI scan" because "[a]n MRI scan is very poor at visualizing blood, acute blood, particularly if it's just a small amount . . . [a]nd, really, CAT scan is best." Dr. Margraf further testified that "the MRI scan is maybe not as sensitive at picking up a small amount of acute blood, such as a small contusion, on the convexity."

Next, the Commission found that the "greater weight of the medical evidence" and the testimony of Dr. Margraf and Dr. Freedman supported a finding that plaintiff's subdural hematomas were related to the accident.

Dr. Mitchell Freedman, a board certified neurologist, testified that the type of head trauma plaintiff sustained in the 2 June 2003 motor vehicle accident could facilitate the development of subdural hematomas over a period of a month or two. Dr. Freedman further testified that it was quite "common" that an MRI performed two days following a head trauma would not reflect any evidence of subdural hematomas that may have been facilitated by that head trauma. He testified that subdural hematomas represent a "very slow leak of blood" and develop "very, very insidiously and very slowly." He said

that "very often" the patients who suffer from subdural hematomas have trauma which dates back to "one, two or even three months before the subdurals were found." Dr. Freedman testified:

> Assuming there is no other history of other head injuries, then it is more likely than not that the motor vehicle accident was the cause of the subdural. There does not appear in the medical record to be any other specific head injuries of sufficient magnitude to override or to trump that issue as the cause of the subdural.

Dr. Freedman conceded that subdural hematomas can occur spontaneously, but concluded:

> [I]f you have a man who's had a closed head injury and two months later develops a subdural, . . . and there's no other interceding explanation, clotting disorders, medical problems, other trauma, then I think you have to say that it is more likely than not that the motor vehicle accident was the cause of the subdural.

On cross examination, Dr. Freedman reiterated, "[H]ere's a guy that's in a car accident, hits a light pole. He has a laceration of the ear and then two months later has a subdural. It's kind of a no-brainer."

Dr. Margraf testified that he ordered a CT scan of plaintiff when he first saw him on 8 August 2003. He testified that the CT scan showed that plaintiff had bilateral subdural hematomas involving both the left and right side, where the right subdural hematoma was larger. Dr. Margraf recommended a craniotomy on plaintiff's right side, based on the increased size of the right subdural hematoma, in which he would "start with a relatively simple burr hole for evacuation of the subdural, which is a small removal of bone . . . opening the covering around the brain and draining the subdural liquid to release the pressure." During the surgery, Dr. Margraf found "crank case oil" or dark blood which he described as "a sign of a more chronic subdural, meaning two weeks . . . or older." When asked whether Dr. Margraf had an opinion based on a reasonable degree of medical certainty as to the cause of plaintiff's bilateral subdural hematomas, Dr. Margraf testified, "I believe that the subdurals, given the history, are related to the traumatic event to the head[—i.e., the motor vehicle accident—]which [plaintiff] sustained on . . . [2] June 2003." He testified that it was not unusual that subdural hematomas would not be evident on an MRI scan two days post trauma. Dr. Margraf testified that plaintiff likely had a slowly progressing chronic subdural

hematoma, which could be tolerated for some period of time until the increase in pressure caused him to become symptomatic.

Defendants also rely on *Young v. Hickory Business Furniture*, 353 N.C. 227, 538 S.E.2d 912 (2000), to argue that there was no competent evidence to find causation of plaintiff's subdural hematomas since the cause could not be definitively established. In *Young*, plaintiff claimed she developed fibromyalgia as a result of an employment-related injury. Fibromyalgia is "an illness or condition of unknown etiology" for which "there were no physical tests that one [could] perform, or testing of any kind with regard to chemical abnormality in the body, which would indicate whether a person has fibromyalgia." *Young*, 353 N.C. at 231, 538 S.E.2d at 915. When considering this issue, the Court noted:

> Due to the complexities of medical science, particularly with respect to diagnosis, methodology and determinations of causation, this Court has held that "where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." However, when such expert opinion testimony is based merely upon speculation and conjecture, it can be of no more value than that of a layman's opinion. As such, it is not sufficiently reliable to qualify as competent evidence on issues of medical causation.

*Id.* at 230, 538 S.E.2d at 915 (citation omitted). In *Young*, the Court found that, because plaintiff's treating rheumatologist was not only unable to determine the cause of plaintiff's fibromyalgia, but also could not definitively diagnose plaintiff with fibromyalgia, the testimony—which was the only evidence offered in support of plaintiff's claim—was "based entirely upon conjecture and speculation." *Id.* at 231, 538 S.E.2d at 915. We do not believe *Young* is analogous to the present case.

Unlike fibromyalgia, there are physical tests which can be performed to indicate whether a person has subdural hematomas, and one of those tests was performed in the present case. The 8 August 2003 MRI clearly indicated that plaintiff had "obvious bilateral subdural hematomas present" which "appear[ed] to be subacute in nature but age [was] indeterminate." Testimony was presented to the Commission that a common cause of subdural hematomas is head trauma like the one suffered by plaintiff in the 2 June accident.

However, defendants contend that testimony from some experts indicated that it was possible that plaintiff could have developed the subdural hematomas as a result of prior undiagnosed small strokes, spontaneous hemorrhaging due to plaintiff's treatment with Plavix following the 2 June 2003 accident, or due to an intervening fall between plaintiff's 4 June MRI and 8 August MRI.

This Court has held that "[s]o long as there is some evidence of substance which directly or by reasonable inference tends to support the findings, this Court is bound by such evidence, even though there is evidence that would have supported a finding to the contrary." *Rose*, 180 N.C. App. at 400, 637 S.E.2d at 257 (internal quotation marks omitted). Therefore, based on plaintiff's medical records and the testimony of treating physicians, we hold there is sufficient evidence to support the Commission's findings that plaintiff's initial head injury and later subdural hematoma were the result of the 2 June 2003 motor vehicle accident. We find no error and affirm the Commission's findings.

III.

[3] Finally, defendants contend that the Commission erred when it determined that plaintiff's second stroke and resulting medical disability were the result of the 2 June 2003 motor vehicle accident. Defendants contend that plaintiff's subdural hematoma was diagnosed and treated successfully by Dr. Margraf with the 9 August 2003 craniotomy and evacuation and drainage of the subdural hematoma.

The Commission found that "the August 9, 2003 surgery performed by Dr. Margraf lessened plaintiff's disability, helped effect a cure to his subdural hematomas, and gave him relief from that condition." However, Dr. Margraf testified and the Commission found that, although plaintiff's initial recovery went well, a few days after the craniotomy, plaintiff suffered increased confusion and "began to exhibit some ballistic movements involving the right lower extremity and, to some extent, the right upper extremity." The 15 August 2003 MRI following the 9 August craniotomy "showed a persistence of his bilateral subdural hematomas, although the right subdural was significantly smaller following the craniotomy." Dr. Margraf testified that "the most obvious conclusion" for the cause of the "new infarct [or stroke] could be related to the subdural collection and the shift and pressure that [plaintiff] had associated with the subdural. That would be number one on my list." Finally, Dr. Margraf testified that the subdural hematoma was a "significant contributing factor" to the stroke

suffered by plaintiff on 15 August 2003. The Commission gave "greater weight" to the expert opinion of Dr. Margraf and found that, "[b]ased on the greater weight of the medical evidence, . . . plaintiff's subdural hematomas, resulting medical problems, functional deterioration, and disability are all related to the June 2, 2003 motor vehicle accident that arose out of and in the course of plaintiff's employment."

Therefore, we hold there is sufficient evidence to support the Commission's findings that plaintiff's second stroke and resulting impairment were the result of the 2 June 2003 motor vehicle accident. We affirm the Commission's Opinion and Award.

Affirmed.

Judges STROUD and ARROWOOD concur.