NO. COA 14-60

NORTH CAROLINA COURT OF APPEALS

Filed: 1 July 2014

JIMMY HILL,
        Employee,
        Plaintiff,

        v.                                    From the North Carolina
                                              Industrial Commission
                                              IC No. X81132
FEDERAL EXPRESS CORPORATION,
Employer, SELF-INSURED
(SEDWICK CMS, Third Party
Administrator),
        Defendant.


        Appeal by plaintiff from the Opinion and Award entered 30

August 2013 by the North Carolina Industrial Commission. Heard

in the Court of Appeals 5 May 2014.


        *Oxner Thomas & Permar, by Justin B. Wraight, for plaintiff-
        appellant.*

        *Hedrick Gardner Kincheloe & Garofalo, LLP, by Brooke M.
        Lewis, and M. Duane Jones, for defendant-appellee.*


        STEELMAN, Judge.

        The Commission's findings of fact were supported by

competent evidence and its findings supported its conclusions of

law. The Commission did not abuse its discretion in its

determinations of the weight and credibility of the evidence,

and did not employ an overly narrow interpretation of the Workers Compensation Act in weighing the evidence.

## I. Factual and Procedural History

Jimmy Hill (plaintiff) was born in 1953 and was 59 at the time of the hearing in this case. In December 2011 plaintiff had been employed as a courier for Federal Express Corporation (defendant) for over 13 years. His duties included loading and delivering packages. As a courier, plaintiff was required to lift 75 pound packages and delivered 80 to 90 packages a day. On 23 December 2011 plaintiff arrived at work shortly before 8:00 a.m. Upon arrival at work, plaintiff checked the lights and brakes in his truck, performed stretching exercises, and began sorting and arranging the packages in his truck.

On a normal day, couriers were required to deliver packages in order of priority, based on factors such as the need to deliver refrigerated medications in a timely manner or the fact that a customer had paid for express delivery. To accomplish this, plaintiff might drive past some delivery locations, and return to them after he completed the priority deliveries. On 23 December 2011, two factors led defendant to abandon its usual prioritizing. First, because it was the last business day before Christmas, plaintiff had so many deliveries that he had to place packages on the floor of his truck. Secondly, a plane bringing

packages for delivery was delayed, so that instead of leaving the warehouse at 8:15, plaintiff did not leave until about 9:00 a.m. Plaintiff's supervisor agreed that plaintiff should deliver packages on the floor as soon as possible, and that he could use a "straight line" delivery route, stopping at each delivery location as he came to it, even if this resulted in delayed delivery of packages to customers who had contracted for early morning delivery.

Between 9:00 and 11:00 a.m., plaintiff delivered about 20 packages. Shortly after 11:00 a.m., plaintiff began experiencing impaired vision and significant difficulties with motor control. He was able to park at a nearby fire station, and was taken by ambulance to Moses Cone Hospital. Plaintiff was diagnosed with a stroke cause by a carotid dissection, which is a tear in a blood vessel. Plaintiff was treated in the hospital for about five days, followed by a period of rehabilitative therapy. Plaintiff made a good recovery, but as of the time of the hearing he was still experiencing cognitive and physical effects of the stroke, and had not been able to return to work.

Plaintiff filed a claim for workers compensation benefits, which defendant denied on the grounds that plaintiff had experienced "no work related accident resulting in injury." The Full Commission issued its Opinion and Award on 30 August 2013,

denying plaintiff's claim for workers compensation benefits. The Commission concluded that "plaintiff's job duties as a courier for FedEx on December 23, 2011 were not a significant factor in his development of a carotid dissection and did not cause the carotid dissection that led to his stroke."

Plaintiff appeals.

## II. Standard of Review

Appellate review of an Industrial Commission order is "limited to reviewing whether any competent evidence supports the Commission's findings of fact and whether the findings of fact support the Commission's conclusions of law[.]" *Deese v. Champion Int'l Corp.*, 352 N.C. 109, 116, 530 S.E.2d 549, 553 (2000). The Commission has sole responsibility for evaluating the weight and credibility to be given to the record evidence. *Id*. (citation omitted). Findings that are not challenged on appeal are "presumed to be supported by competent evidence" and are "conclusively established on appeal." *Johnson v. Herbie's Place*, 157 N.C. App. 168, 180, 579 S.E.2d 110, 118 (2003). The "Commission's conclusions of law are reviewed *de novo*." *McRae v. Toastmaster, Inc.*, 358 N.C. 488, 496, 597 S.E.2d 695, 701 (2004) (citation omitted).

The "claimant in a workers' compensation case bears the burden of initially proving 'each and every element of

compensability' . . . by a 'greater weight' of the evidence or a 'preponderance' of the evidence." *Adams v. Metals USA*, 168 N.C. App. 469, 475, 608 S.E.2d 357, 361 (2005) (quoting *Whitfield v. Laboratory Corp. of Am.*, 158 N.C. App. 341, 350, 581 S.E.2d 778, 784 (2003), and *Phillips v. U.S. Air, Inc.*, 120 N.C. App. 538, 541-42, 463 S.E.2d 259, 261 (1995)). "To establish 'compensability' . . . a 'claimant must prove three elements: (1) [t]hat the injury was caused by an accident; (2) that the injury arose out of the employment; and (3) that the injury was sustained in the course of employment.'" *Clark v. Wal-Mart*, 360 N.C. 41, 43, 619 S.E.2d 491, 492 (2005) (quoting *Gallimore v. Marilyn's Shoes*, 292 N.C. 399, 402, 233 S.E.2d 529, 531 (1977)). In this case the parties disagree about whether plaintiff presented evidence that (1) his employment bore a causal relationship to his carotid dissection, and (2) whether on 23 December 2011 there was an interruption of plaintiff's normal work routine and the introduction of unexpected or unusual circumstances such that the Commission might find that he suffered an injury by "accident."

"Our Supreme Court has defined the term 'accident' as used in the Workers' Compensation Act as 'an unlooked for and untoward event which is not expected or designed by the person who suffers the injury.' The elements of an 'accident' are the

interruption of the routine of work and the introduction thereby of unusual conditions likely to result in unexpected consequences. Of course, if the employee is performing his regular duties in the 'usual and customary manner,' and is injured, there is no 'accident' and the injury is not compensable." *Porter v. Shelby Knit, Inc.*, 46 N.C. App. 22, 26, 264 S.E. 2d 360, 363 (1980) (quoting *Hensley v. Cooperative*, 246 N.C. 274, 278, 98 S.E. 2d 289, 292 (1957), and citing *Pardue v. Tire Co.*, 260 N.C. 413, 132 S.E. 2d 747 (1963), and *O'Mary v. Clearing Corp.*, 261 N.C. 508, 135 S.E. 2d 193 (1964)).

In *Gunter v. Dayco Corp.*, 317 N.C. 670, 346 S.E.2d 395 (1986), our Supreme Court upheld a workers' compensation award where the claimant injured his arm while performing "twisting movements" shortly after starting a new job requiring these unaccustomed movements. Similarly, in *Salomon v. Oaks of Carolina*, 217 N.C. App. 146, 718 S.E.2d 204 (2011), we upheld the Commission's determination that a nursing assistant suffered an injury by accident where her injury was caused by a patient's unusual and unexpected resistance to the plaintiff's care. However, an injury is not the result of an "accident" simply because it occurs during a challenging workday in which the claimant performs his or her usual duties under more difficult conditions. *See, e.g., Southards v. Motor Lines,* 11 N.C. App.

583, 585, 181 S.E.2d 811, 813 (1971) (holding the Commission's findings insufficient to support award, given that the "fact that plaintiff was handling a different commodity than usual, without more, and that the weather was hot, are not enough to satisfy the requirement of an 'interruption of the work routine and the introduction of unusual conditions likely to result in unpredicted consequences[.]' . . . Nor is the mere fact that plaintiff was in a hurry[.]") (citing *Gray v. Storage, Inc.*, 10 N.C. App. 668, 179 S.E.2d 883 (1971)).

## III. Commission's Findings of Fact

Plaintiff's first argument challenges the evidentiary support for the Commission's findings concerning whether the circumstances of plaintiff's employment on 23 December 2011 constituted "an unlooked for and untoward event" or "interruption of the routine of work and the introduction thereby of unusual conditions likely to result in unexpected consequences." *Shay v. Rowan Salisbury Sch.*, 205 N.C. App. 620, 624, 696 S.E.2d 763, 766 (2010) (citation omitted). Plaintiff argues that the Commission erred in making findings on this issue that were not supported by competent evidence. We disagree.

The Commission's findings about the circumstances of plaintiff's job on 23 December 2011 included the following:

> 1. As of the date of the hearing before the Deputy Commissioner, plaintiff was 59 years

old and had been employed by defendant for 14 years as a courier[.] . . .

2. As a courier, plaintiff was required to load his truck, deliver packages, and pick up packages. Plaintiff typically handled small and large packages of varying weights. He testified that he lifted packages weighing between 75 and 150 pounds, and it was not unusual for plaintiff to deliver 85 to 90 packages a day.

. . .

4, In December 2011, plaintiff was driving a sprinter truck. . . . [He] was familiar with the operation of the truck[.] . . .

5. Plaintiff had worked as a courier for defendant during the Christmas season for many years, and he testified that the Christmas season is always a busy time for FedEx couriers. Plaintiff had not driven the particular route he was driving on December 23, 2011 during prior Christmas seasons; however, he had been driving this particular route since his old route had been switched over to the new FedEx hub. The only difference between the two routes that plaintiff was able to identify at the hearing before the Deputy Commissioner was that the route he was assigned sometime after Christmas 2010 was more residential than his prior route.

6. On a 'regular' day, defendant operates on a priority schedule, such that priority overnight packages have to be delivered by 10:30 a.m. . . . Because of the priority package delivery times, couriers would load their trucks and drive their route so that the priority packages could be delivered first and on time. This meant that a courier might drive past a stop that the courier would come back to later in the day. . . . [During the winter] the couriers typically

rush to complete their deliveries . . . before it gets dark and becomes difficult to see the house numbers.

7. As a courier, plaintiff would generally . . . start his route at approximately 8:00 or 8:10 am. However, if the plane bringing incoming freight was delayed, plaintiff would be delayed in starting his route.

8. It was not unusual for planes to be delayed. To address this contingency, defendant had implemented protocols to address the delivery of packages, such as foregoing priority delivery and going to a 'straight line' delivery method, which involves the couriers making each stop on their route, rather than bypassing some stops in the route in order to go on to the next priority delivery. . . .

9. On December 23, 2011, the plane bringing in the freight that had to be delivered that day was late to arrive. Plaintiff testified that this allowed him to spend some time lining up the freight that was already in his truck, and to swap off routes with other drivers. . . . When asked by his attorney whether a late plane put any pressure on him, plaintiff testified that it just means you will be in a different traffic pattern when you eventually start your route. Plaintiff testified that he left the hub at "9:00 something" on [that] morning[.] . . .

10. Plaintiff testified that on December 23, 2011, he had large packages on his truck; however, he did not testify as to whether those packages were any larger than the packages he regularly had to deliver. Plaintiff also testified that he did not know how many packages he had on his truck when he left the hub on December 23, 2011, but that this day was different because of "the amount of packages that was there and the size and awkwardness of it[.]" . . .

[That day] was the first time that he ever had to deliver a flat screen TV, but there was no testimony that the flat screen TV weighed any more than other packages he had delivered over the past 13 years. Finally, he testified that the floor of his truck was filled with packages and that he had to step over packages when he made his deliveries.

Based on its findings concerning the circumstances of plaintiff's work on 23 December 2011, the Commission stated in Finding No. 21 that:

21. Based upon a preponderance of the evidence in view of the entire record, the Full Commission finds that plaintiff did not suffer an interruption of his regular work routine on December 23, 2011. Plaintiff's job by its very nature requires that he rush to make timely deliveries. Plaintiff was very busy every Christmas season. The evidence of record does not support a finding that plaintiff was busier on December 23, 2011 than he had been at other times during the 2011 Christmas season or during past Christmas seasons. The evidence does not support a finding that the late arrival of the plane caused him to rush any more than usual. In fact, plaintiff had more time to organize his truck, and he did not have to complete the priority deliveries by 10:30. While his truck may have been very full, there is no evidence that having to step over packages on the floor or move awkwardly in the truck was not something he had had to do during past Christmas seasons.

We hold that the Commission's findings are supported by competent evidence. In arguing for a contrary result, plaintiff challenges only a few excerpts from Findings of Fact 5,8, 9, and 21 which he contends were not supported by competent evidence.

The remaining findings, which as discussed above are conclusively established given that they are not challenged, are sufficient to support the Commission's conclusion that plaintiff was not subjected to any significant interruption of his work routine. Furthermore, our review reveals that the challenged excerpts are supported by competent evidence.

Plaintiff first contends that the Commission erred in Finding No. 8 by finding that it was not unusual for planes to be late, and argues that the "record is devoid of any evidence that supports this finding." Plaintiff testified that defendant identified the situation of a delayed plane as a "code 43" and that specific procedures were in place for the couriers to follow in response to delays. The Commission could reasonably find that the existence of a specific identification code and an alternative plan for use when planes were delayed was evidence that this occurrence was not unusual. This argument lacks merit.

Plaintiff also argues that the Commission erred in Finding of Fact 5 by finding that the only difference plaintiff identified between his former delivery route and the route he was assigned in 2011 was that the newer route was more residential. Plaintiff asserts that this finding "is quite contrary to the testimony in this matter and is not supported by competent evidence." However, plaintiff does not dispute that he

testified that the newer route was more residential, and does not identify any other differences between the two delivery routes. Instead, he argues that <u>other</u> aspects of plaintiff's work day on 23 December 2011 were unusual. The Commission did not err by finding that the only difference plaintiff noted between his 2011 route and his route prior to Christmas 2010 was that the new route was more residential.[1]

In addition, plaintiff argues that the Commission erred in Finding of Fact 9, by finding that the plane's delay allowed plaintiff additional time to arrange the freight in his truck, or to trade routes or deliveries with other drivers. Plaintiff asserts that this finding "is completely contradicted by the testimony." However, when plaintiff was asked to discuss the effect of a late plane on his work day, he testified that:

> We had a 43 at 8:05 I'm thinking. It's on my timecard. A 43 is a delay for planes and really it – I mean, you don't want a late plane but really <u>that gave us time to line up what we had already there [in the truck.] And then the couriers will swap off on the routes</u> that's close to you, you know. "Can you hit this on your way down to so-and-so because this the only one I've got in that area?" And we swapped off, you know during that time and all, [and] finished loading our trucks[.]" **(Tp 13)**

---

[1] We also note that plaintiff failed to offer evidence concerning the significance, if any, of the residential character of the new route. For example, he did not testify that it was harder to service a residential delivery route, or that it took longer.

(emphasis added). This finding was clearly supported, rather than "completely contradicted" by the above-quoted testimony.

Plaintiff also asserts that Finding No. 21 "demonstrates multiple examples of conclusions which are not supported by competent evidence." Plaintiff challenges the finding that "the evidence does not support a finding that the late arrival of the plane caused [plaintiff] to rush any more than usual," and asserts that plaintiff "unequivocally testified that late planes wreak havoc on [his] normal job[.]" Plaintiff testified that the delay gave him additional time to organize his route and trade deliveries with other couriers. Also, in response to the delay, defendant adjusted some of its normal policies; for example, couriers were permitted to deliver packages in a straight line, even if that meant that overnight deliveries were delayed. On the other hand, the late start gave plaintiff less time to complete the route before dark. Plaintiff was never asked whether overall his job was easier or harder when a plane was delayed, and he certainly never testified "unequivocally" that the situation "wreaked havoc" on his delivery schedule. In addition, plaintiff testified that he delivered 80 or 90 packages a day. He experienced stroke symptoms after working only two hours and delivering about 20 packages, a rate of delivery that was no faster than usual. We hold that the

challenged portions of the Commission's findings were supported by competent evidence.

Plaintiff also cites findings of fact made by the Deputy Commissioner and asserts that they illustrate "the abnormalities and unusual circumstances which Plaintiff faced on the day of his injury." However, "[w]hether the full Commission conducts a hearing or reviews a cold record, N.C.G.S. § 97-85 places the ultimate fact-finding function with the Commission - not the hearing officer." *Adams v. AVX Corp*., 349 N.C. 676, 681, 509 S.E.2d 411, 413 (1998). "[T]he Full Commission reviews appeals from the Deputy Commissioner *de novo*. Therefore, the Deputy Commissioner's findings are irrelevant and have no bearing on the instant case." *Newnam v. New Hanover Regional Med. Ctr.*, __ N.C. App. __, __, 711 S.E.2d 194, 200 (2011) (citing *Watkins v. City of Wilmington*, 290 N.C. 276, 280, 225 S.E.2d 577, 580 (1976)).

Plaintiff has also failed to articulate the legal or medical significance of the circumstances he posits as unusual. He offers no reasons why a delayed plane, busy time of year, or packages on the truck's floor might have resulted in his injury. We hold that the Commission's findings of fact were supported by competent evidence, and that they supported its conclusion that on 23 December 2011 plaintiff did not experience an interruption

of his work routine. Plaintiff's arguments to the contrary lack merit.

## IV. Commission's Determinations on Weight and Credibility

Plaintiff's next argument challenges the Commission's findings concerning whether the medical evidence showed a causal relationship between his employment and his injury. This argument lacks merit.

The Commission concluded that the greater weight of the evidence showed that his job duties on 23 December 2011 "were not a significant factor in his development of a carotid dissection and did not cause the carotid dissection that led to his stroke." This conclusion was supported by its findings, including the following:

. . .

11. At approximately 11:00 a.m. on December 23, 2011, after plaintiff had made 20 deliveries, he began to experience blurred and distorted vision[, and] . . . difficulty with his fine motor skills[.] . . . [He] drove to a nearby fire station[, where a fireman] . . . called an ambulance to transport him to the hospital.

12. Plaintiff was then transported to the Moses Cone Hospital Emergency Department where he was examined by Dr. Pramod P. Sethi[.] . . . [P]laintiff had a major occlusion of the internal carotid artery of the neck. . . . [Dr. Deveshwar] performed an emergency catheter angiogram [which] . . . revealed a carotid dissection[,] . . . [and] used a balloon and a stent to open the

dissected area and administered clot-busting medicine[.] . . .

13. . . . [Plaintiff] sustained a . . . stroke, secondary to . . . a left internal carotic artery occlusion from a left internal artery dissection. Plaintiff remained in the hospital until December 28, 2011. As of the date of his discharge, plaintiff continued to experience problems with his speech and motor movement on his right side. He was prescribed medication and referred to rehabilitation therapy[.]. . .

14. A carotid dissection occurs when a rupture or tear develops in the inner layer of the carotid artery, causing blood to seep between the layers of the artery to cause an occlusion, which if left undetected causes a clot to develop, which in turn causes a stroke. No one knows how long it takes between the time the artery dissects and the time the patient begins to show symptoms of a stroke, but it is a multi-stage process which Dr. Coin believes could possibly take a few days to a week. Dr. Coin, a neurologist who reviewed plaintiff's medical records and testified as an expert at defendant's request, testified that it would be difficult for him to understand how it could all happen within three hours[.] . . . Dr. Daniel Gentry, plaintiff's family doctor, testified that a dissection "comes from a defect plus time."

15. Dr. Sethi testified that several things can cause a carotid dissection, including "minimal postural trauma" . . . or a hereditary condition[.] . . . People who suffer from cardiovascular disease . . . are predisposed to suffer a carotid dissection. Advanced age (i.e., over 50) . . . [is another] risk factor[] for developing a carotid dissection.

16. With regard to trauma specifically, Dr. Sethi testified that any minor trauma can cause a dissection, but minor trauma will not cause a dissection in everyone. . . . Dr. Sethi went on to explain that most acute traumatic events have a sudden and unexpected character, such as a quick blow to the neck or an abrupt turning of the head with lateral flexion of the neck. Dr. Coin testified that a dissection could be caused by obvious external trauma, such as a motor vehicle accident, or some trivial "trauma" such as coughing, wrenching your neck or even simply turning the head from one side to the other. Dr. Gentry was of the opinion that no one can really "put their finger on" what causes a dissection in any given case, and that it would be impossible to say that an abrupt turning of the head caused a dissection. According to Dr. Gentry, there is no scientific or medical evidence that activity such as . . . lifting packages in a truck could cause a dissection. He also disagreed with . . . [the] suggestion that you would expect a dissection to come from some sort of unusual exertion.

. . .

18. Prior to the hearing before the Deputy Commissioner, plaintiff's counsel sent Dr. Sethi a letter setting forth questions regarding the cause of plaintiff's carotid dissection. The letter to Dr. Sethi included an affidavit signed by plaintiff which set forth several ways in which Plaintiff contends that his workday on December 23, 2011 was unusual. After reviewing the affidavit in which plaintiff stated that December 23, 2011 was an usually busy day during which he was rushing to make deliveries of unusually heavy packages of unusual shape in the time allotted, during which he had to contort his body into awkward positions, Dr. Sethi stated on the questionnaire that (1) plaintiff's job

duties and responsibilities as a courier more likely than not [were] a significant factor in his suffering a left internal carotid artery occlusion resulting from dissection on December 23, 2011; and (2) plaintiff's left internal carotid artery dissection on December 23, 2011 was more likely than not caused by a traumatic event, such as an abrupt turning of the head with lateral flexion of the neck, when he was maneuvering himself in a crowded delivery truck and lifting heavy packages. However, when asked on cross-examination about his answers on the questionnaire, Dr. Sethi testified: "I didn't say it caused. I said it could have contributed. It's possible that it played a role." With regard to his response to the question about an abrupt turning of the head, Dr. Sethi stated on cross-examination that "there's no possible answer here. I think it's possible it could have been caused by that."

19. While plaintiff did testify at the hearing that he had to move awkwardly in the back of the truck on December 23, 2011 due to the number of packages on the floor and the location of the shelves, there is no evidence of record that, at any point, plaintiff had to abruptly turn his head.

20. Dr. Coin testified that he considered Plaintiff's job duties to be a "trivial trauma in the same category of probably . . . numerous things that could have happened in the week prior to his stroke and that you could not with a degree of certainty identify that as a significant factor for his dissection." Dr. Coin also testified that plaintiff's job duties did not place him at an increased risk of suffering a dissection. In this regard, Dr. Sethi testified that all FedEx drivers are not at an increased risk of having a dissection.

21. Based upon a preponderance of the evidence in view of the entire record, the Full Commission finds that plaintiff did not suffer an interruption of his regular work routine on December 23, 2011. . . . Moreover, there is no evidence that anything happened at any point to cause plaintiff to have to abruptly turn his head. At the time plaintiff experienced the onset of his stroke symptoms, he had only delivered 20 packages, when he was accustomed to delivering 85 to 90 packages a day.

22. The Full Commission places greater weight on the testimony of Dr. Coin and Dr. Gentry with regard to the issue of whether anything Plaintiff did on December 23, 2011 caused his carotid dissection and subsequent stroke. Based upon a preponderance of the competent, credible evidence of record, the Full Commission finds that plaintiff's job duties as a courier for FedEx on December 23, 2011 were not a significant factor in his development of a carotid dissection and did not cause the carotid dissection that led to his stroke.

These findings are supported by competent evidence and support the Commission's conclusion that plaintiff did not sustain an injury by accident.

In arguing for a different result, plaintiff contends that the Commission "erred in affording greater weight to Dr. Coin's testimony, as Dr. Coin was not competent to testify and his testimony was based upon mere conjecture and speculation." Plaintiff does not challenge Dr. Coin's qualification as an expert witness. Instead, he directs our attention to aspects of Dr. Coin's testimony that, in plaintiff's opinion, render it

less compelling than other evidence. For example, plaintiff asserts that Dr. Coin's review of his medical history was incomplete and that some of Dr. Coin's opinions were contradicted by those of Dr. Gentry. Plaintiff also asserts as a "fact" that "Plaintiff suffered minor trauma - a twist, a turn, a jolt - which dissected the carotid artery and led to the stroke," although plaintiff did not testify to any sudden movement and the expert witnesses did not agree that such an incident caused his injury. In essence, plaintiff is asking us to reweigh the evidence, which we will not do:

> Because it is the fact-finding body, the Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony. The Commission's findings of fact are conclusive on appeal if they are supported by any competent evidence. Accordingly, this Court does not have the right to weigh the evidence and decide the issue on the basis of its weight.

*Shaw v. US Airways, Inc.*, __ N.C. App. __, __, 720 S.E.2d 688, 690 (2011) (quoting *Johnson v. Lowe's Cos.*, 143 N.C. App. 348, 350, 546 S.E.2d 616, 617-18 (2001) (internal citations and quotations omitted)). Plaintiff's argument that Dr. Coin's testimony was "incompetent" and based solely on "speculation" is without merit.

## V. Commission's Conclusions of Law

Plaintiff argues next that the Commission's conclusions of law are not supported by its findings of fact. Plaintiff does not assert that the Commission's conclusions do not logically rest upon its findings. Instead, he argues that the Commission should have made different findings, repeating earlier arguments, which we have rejected, concerning the evidentiary support for the Commission's findings. This argument is without merit.

## VI. Commission's Interpretation of Statutory Law

Finally, plaintiff argues that "contrary to the well-settled law of the State of North Carolina, the Industrial Commission narrowly construed the North Carolina Workers' Compensation Act in detriment to the plaintiff." This argument lacks merit.

Plaintiff notes that the Workers' Compensation Act "'should be liberally construed to effectuate its purpose to provide compensation for injured employees or their dependents, and its benefits should not be denied by a technical, narrow, and strict construction.'" *Billings v. General Parts, Inc.*, 187 N.C. App. 580, 584, 654 S.E.2d 254, 257 (2007) (quoting *Adams*, 349 N.C. at 680, 509 S.E.2d at 413 (internal quotation omitted). Plaintiff also points out that on appeal, in determining whether competent evidence supports the Commission's findings of fact, the

"evidence tending to support plaintiff's claim is to be viewed in the light most favorable to plaintiff, and plaintiff is entitled to the benefit of every reasonable inference to be drawn from the evidence." *Adams* at 681, 509 S.E.2d at 414 (citing *Doggett v. South Atl. Warehouse Co.*, 212 N.C. 599, 194 S.E. 111 (1937)).

Plaintiff contends that the Commission failed to follow these principles when it stated in Finding of Fact 10 that plaintiff had testified that he had large packages in his truck on 23 December 2011, but that he "did not testify as to whether those packages were any larger than the packages he regularly had to deliver." Plaintiff does not dispute the accuracy of this characterization of his testimony at the hearing. Rather, he directs our attention to an affidavit signed by plaintiff stating that his truck held packages that were unusually heavy. Plaintiff appears to argue, without citation to authority, that when the Commission resolves contradictions in the evidence or issues of credibility, it must employ the standard applicable to appellate review, and that the Commission erred when it "failed to take Plaintiff's affidavit in the light most favorable to Plaintiff[.]" However, "it is well-established that the Commission may accept or reject the testimony and opinions of any witness, even if that testimony is uncontradicted." *Nobles*

*v. Coastal Power & Elec., Inc.*, 207 N.C. App. 683, 693, 701 S.E.2d 316, 323 (2010) (citing *Hassell v. Onslow Cty. Bd. of Educ.*, 362 N.C. 299, 306-07, 661 S.E.2d 709, 715 (2008)). This argument is without merit.

For the reasons discussed above, we conclude that the Industrial Commission did not err and that its Opinion and Award should be

AFFIRMED.

Chief Judge MARTIN and Judge DILLON concur.