SCHOOL COMMISSIONERS, CITY OF CHARLOTTE, v. BOARD OF ALDERMEN AND TREASURER, CITY OF CHARLOTTE.

(Filed 28 February, 1912.)

1. **Municipalities—Discretionary Powers—Mandamus—Practice.**

    Mandamus does not lie to enforce the exercise of a discretionary power vested in the officials of a municipal corporation by the Legislature, in any given or specified way.

2. **Statutes—Interpretation—Language Employed—Plain Intent.**

    When the language of a statute is plain and free from ambiguity, expressing a single, definite, and sensible meaning, that meaning is conclusively presumed to be the meaning which the Legislature intended, and the statute must be interpreted accordingly.

3. **Same—Municipalities—Aldermen—School Board—Discretion.**

    A charter of a city which provides for the maintenance of public schools, creating a board of commissioners with exclusive control, separate from the board of aldermen, with ample power to purchase sites and to provide necessary school buildings and facilities; to employ teachers and fix their salaries, etc.; and, in general, to do anything that may be necessary and proper to open and conduct a sufficient number of schools to meet the needs of the scholastic population of the city, etc., leaves nothing to the discretion of the board of aldermen of the city in regard to the selection of a site for school purposes by the school commissioners of the town; and the board of aldermen are without authority to withhold from the school commissioners moneys received by them from a valid bond issue they were authorized to issue for school purposes, upon their assumption that a certain site in which the money was to be invested by the school commissioners was not one suitable for the purposes intended.

4. **Statutes—Interpretation—General Intent—Particular Intent.**

    When a general intent is expressed in a statute, and the act also expresses a particular intent incompatible with the former, the particular intent is to be considered in the nature of an exception.

5. **Same—Municipalities—School Board—Board of Aldermen—Discretionary Powers.**

    A general legislative power of government and control over a city given to the board of aldermen will not be so construed as to defeat the clearly expressed intention of another part of the act giving to a board of school trustees the exclusive control of

schools of the city, with the power to select sites for schools therein, etc., so as to permit the board of aldermen a discretionary power to withhold moneys obtained for school purposes, or to determine whether a site selected by the school trustees was a suitable one.

6. **Statutes—Interpretation—Powers Conferred—Abuse of Powers.**

Conditions relevant as tending to show such a manifest abuse of discretion on the part of a board of school commissioners in the exercise of a legislative power to control the schools of a city, and to select sites and build schoolhouses thereon, as would render their action illegal, would involve the abuse of admitted powers and in no way affect the existence of the powers themselves.

APPEAL from *Lyon, J.,* at January Term, 1912, of MECKLENBURG.

Civil action, instituted by School Commissioners of the City of Charlotte to compel the board of aldermen and treasurer of said city to turn over to treasurer of the school board the proceeds arising from the sale of certain school bonds issued by the city of Charlotte under and by virtue of chapter 317, Private Laws 1911. On the hearing, judgment was rendered in manner and form as follows:

This cause coming on to be heard pursuant to the summons issued therein, and the court having heard and considered the pleadings in the cause and argument of counsel: Now, therefore, upon motion of Burwell & Cansler and Tillett & Guthrie, attorneys for the plaintiff, it is adjudged that the plaintiff is entitled to have the proceeds of the school bonds referred to in the pleadings paid over to its treasurer as soon as the said treasurer shall give bond in proper form and in the amount required by the statute; and the said defendants and each of them are hereby commanded to turn over and deliver to the treasurer of the plaintiff all of the proceeds of the said school bonds now under their custody and control as soon as the treasurer of the plaintiff shall give a bond approved by the plaintiff. It is further adjudged that the plaintiff recover the costs of this action, to be taxed by the clerk of this court. Heard, considered, and decided upon this 24th day of January, 1912.

C. C. LYON,
*Judge Presiding.*

Defendants having duly excepted, appealed to Supreme Court.

*Burwell & Cansler and Tillett & Guthrie for plaintiffs.*
*Chase Brenizer for defendant.*

HOKE, J. Chapter 317, Private Laws 1911, conferred upon the Board of Aldermen of the City of Charlotte the power, on approval of the popular vote, to issue bonds for various purposes, not to exceed, in the aggregate, the sum of $1,065,000, and specified that a portion of these bonds, not to exceed in amount the sum of $100,000, should be known as "school bonds" and to be used for the purpose of purchasing lands for schools and of building schoolhouses for the graded schools of the city. The act also providing "that moneys arising from the sale of the bonds" should be used for no other purpose than that for which they were authorized to be issued. In taking the sense of the qualified voters, the different purposes were to be submitted as separate propositions and the votes taken in five different ballot boxes; and, in reference to the effect of the election, the act in question further provides: "If a majority of such qualified voters shall vote 'Issue' on any one or more of the five propositions submitted for issuing bonds for the purposes aforesaid, then it shall be deemed and held that the proposition receiving a majority of such votes is favored and approved by a majority of the qualified voters of the city of Charlotte, and the board of aldermen shall cause bonds to be prepared and issued for the purposes so approved of by a majority of qualified voters of the city, and levy a tax in accordance with the provisions of this act." The measure having been approved by the popular vote, the bonds in question were issued and sold and the proceeds are now held by defendants, subject to the provisions of the law and the judgment of the court on the questions presented. It further appears that the plaintiffs, the School Board of the City of Charlotte, having made selection of certain sites for school purposes, have made demand on defendants that the fund in question be turned over to their treasurer, and defendants, the board of aldermen, professing a willingness to turn over $80,000 of said fund, the amount apportioned for four of the school sites, has refused to turn

158—13

over the remaining $20,000, the amount apportioned for the public schools of North Charlotte, contending that the site selected for school purposes in that section of the city is not a suitable or proper one and that, under the charter of the city of Charlotte, and other acts relevant to the inquiry, and by reason of the powers conferred in said acts on the board of aldermen of the city, that said body must of necessity have a discretionary supervision of these matters and the ultimate power of determining whether the moneys in question shall or shall not be expended in the purchase of the site selected. If defendants are correct in their position, that they are possessed of discretionary power in the premises, the present action must fail, for it is familiar doctrine that mandamus does not lie to enforce the exercise of discretionary power in any given or specified way. *Board of Education v. Board of Commissioners,* 150 N. C., 116; *Barnes v. Commissioners,* 135 N. C., 27; *Ewbank v. Turner,* 134 N. C., 77. Coming, then, to this the principal question presented, the revised charter of the city of Charlotte, enacted by the General Assembly in 1907, in reference to the public school system of the city and on matters more directly relevant to the inquiry, makes provision as follows:

"SEC. 193. That there shall be maintained in the city of Charlotte a system of public schools to be kept open not less than nine months in each year, without charge, for the education of the children of the said city within the ages of six and twenty-one years.

"SEC. 194. That said system of public schools shall be under the control of a board of school commissioners, composed of seventeen members, who shall be elected biennially at the general election held for mayor and other city officers, and shall hold office for two years, and until their successors are duly elected and qualified, and shall serve without compensation. Any vacancy in said board of school commissioners shall be filled by an election held by said board, and the person so elected shall hold office for the unexpired term.

"SEC. 195. Said board of school commissioners shall be a body corporate and politic under the name of 'The School Com-

missioners of the City of Charlotte,' with all rights and powers
of the school committees of the respective townships, in addi-
tion to the powers in this act granted.

"SEC. 196. That the Mayor of the City of Charlotte shall be
*ex officio* chairman of said board of school commissioners, and
shall be entitled to vote in any of the meetings of said board
only in the case of a tie; and in all meetings of said board a
majority of the membership thereof shall constitute a quorum
for the transaction of business.

"SEC. 197. That said board of school commissioners shall
have exclusive control of the public schools of the city of Char-
lotte, and shall have full and ample powers to purchase sites,
to provide necessary school buildings and facilities, to appoint
examiners, employ teachers and fix their salaries, prescribe
courses of study, and in general to do everything that may be
necessary and proper to open and conduct a sufficient number
of schools to meet the needs of the scholastic population of the
city of Charlotte. And it shall be lawful for said board of
school commissioners, in their discretion, to receive into the
public schools of the city of Charlotte upon such terms as they
may think reasonable any children of school age residing be-
yond the limits of said city."

"SEC. 201. The said board of school commissioners shall
appoint a treasurer, and prescribe his duties and compensation.
He shall give bond for the faithful performance of his duties
in such sum as the said board may prescribe, which bond shall
not be less than double the amount which may reasonably come
into his hands at any one time, and with sufficient security,
to be approved by said board.

"SEC. 202. It shall be the duty of the Board of Aldermen of
the City of Charlotte to provide for the payment to said treas-
urer of all moneys collected under this act; and it shall be the
duty of the Treasurer of Mecklenburg County to pay to the
treasurer of said board of school commissioners, to be used in
carrying out the objects of this act, all school moneys in his
hands, from time to time, to which the city of Charlotte shall
fairly be entitled."

"SEC. 204. That the board of aldermen shall provide for all
expenses arising from permanent repairs and improvements

made from time to time by said board of school commissioners upon any of the buildings and premises in use for school purposes within the city of Charlotte."

"SEC. 206. That the Board of Aldermen of the City of Charlotte shall levy an annual tax for the support and maintenance of said system of public schools in the city of Charlotte, which annual tax shall not exceed 20 cents on the $100 valuation of property and 60 cents on the poll."

Considering these sections, it is the well-recognized principle that the object of all interpretation is to ascertain the meaning of the Legislature as contained in the statute, and to this end resort must primarily be had to the language of the act itself. Where the statute is free from ambiguity, explicit in terms and plain of meaning, it is the duty of the courts to give effect to law as it is written, and they may not resort to other means of interpretation. The position, as applied to the present case, is very well stated in Black on Interpretation of Laws, as follows: "The object of all interpretation and construction of statutes is to ascertain the meaning and intention of the Legislature, to the end that the same may be enforced." This meaning and intention must be sought first of all in the language of the statute itself. For it must be presumed that the means employed by the Legislature to express its will are adequate to the purpose and do express that will correctly. If the language of the statute is plain and free from ambiguity, and expresses a single, definite, and sensible meaning, that meaning is conclusively presumed to be the meaning which the Legislature intended to convey. In other words, the statute must be interpreted literally. Even though the Court should be convinced that some other meaning was intended by the lawmaking power, and even though the literal interpretation should defeat the very purposes of the enactment, still the explicit declaration of the Legislature is the law, and the courts must not depart from it; and numerous decisions, here and elsewhere, are in approval of the principle as stated. *Kearney v. Vann,* 154 N. C., 311; *In re Applicants for License,* 143 N. C., 1; *Commissioners v. Packing Co.,* 135 N. C., 70; 11 Ency., U. S. Supreme Court Rep., 110; Sedgwick Statutory Constructions, p. 231.

In *Kearney's case, supra,* it was held: "In interpreting a statute the intent is to be first sought in the meaning of the words used, and when they are free from ambiguity and doubt, and express plainly, clearly, and distinctly the sense of the framers of the instruments, no other means of interpretation should be resorted to"; and in the citation to Sedgwick, the author quotes, with approval, from *Fisher v. Bagort,* 2 Cranch., 399, as follows: "When a law is plain and unambiguous, whether it be expressed in general or limited terms, the Legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction."

This charter of the city of Charlotte, and its framers, recognizing the prime importance of affording education to its people, have provided that these schools shall be kept open nine months in each year without charge for the children of the city, etc. For the control and management of the school system, a board of commissioners is established, to be elected by the people of the city. The mayor, while chairman *ex officio,* is not allowed to vote except in case of a tie. The aldermen are required to provide by taxation for the support of the schools and for all expenses arising from permanent repairs and improvements made from time to time by said board of commissioners; and as bearing more directly on the question, section 197 of the charter enacts: "That said board of school commissioners shall have exclusive control of the public schools of the city of Charlotte, and shall have full and ample power to purchase sites, to provide necessary school buildings and facilities, to appoint examiners, employ teachers and fix their salaries, prescribe courses of study, and in general to do anything that may be necessary and proper to open and conduct a sufficient number of schools to meet the needs of the scholastic population of the city of Charlotte."

The Legislature could not have selected language more explicit. There is no ambiguity nor room for construction, and, applying the principle, we are constrained to hold that in giving the board of school commissioners "exclusive control of the public schools of the city" and conferring upon them "full and ample power" to purchase sites, etc., and "do everything that

·is necessary and proper to open and conduct" these schools, the Legislature intended what this language means, and that the board of aldermen are without discretion in the matter. This, in our opinion, being the clear import of the words used in the statute, the position is not affected because in other portions of the charter general powers are given to the board of aldermen, looking· to· the control and well-ordering of the· city and its government, more particularly section 48, which provides that said board shall have control of the "finances and of the property, real and personal, belonging to the city," and confers upon said board power to provide for city's obligations for lighting streets and constructing sewers," etc. There is no necessary conflict of powers presented in the record, and, if there were, the ordinary and accepted rule of interpretation is that when a "general intent is expressed in a statute and the act also ·expresses a particular intent incompatible with the former, the particular intent is to be considered in the nature of an exception. 1 Lewis Sutherland on Statutory Construction (2 Ed), sec. 268; *Rodgers v. U. S.,* 185 United States, 83; *Stockett, Admr., v. Bird,* 18 Md., 484;. *Dahuke v. Reoper,* 168 Ill., 102. Doubtless, as suggested by defendants, if the board of school commissioners should select a site so remote or enter on schemes so extravagant that to carry them out would threaten bankruptcy or serious embarrassment to the city in its financial and business life, these conditions would be relevant as tending to show such manifest abuse of discretion on the part of the commissioners as would render their action illegal; but these considerations would involve the abuse of admitted powers and in no way affect the existence of the powers themselves, this being the question presented here.

In view of the fact admitted, that these funds have been devoted exclusively to school purposes, and of the comprehensive and definite power expressly conferred by the law upon plaintiff board,·we are of opinion, as stated, that the board of aldermen are without discretion in the matter, and the judgment of the Superior Court directing payment to plaintiff should be affirmed. *Battle v. Rocky Mount,* 156 N. C., 329.

Affirmed.