SCOTT CHAISSON, Employee, Plaintiff v. RED SIMPSON, Employer, LIBERTY
MUTUAL INSURANCE COMPANY, Carrier, Defendants

No. COA08-704

(Filed 3 March 2009)

## 1. Workers' Compensation— settlement amount—sufficiency of evidence

The Industrial Commission did not err in a workers' compensation case by its finding of fact stating the parties negotiated a settlement agreement in the amount of $97,500 and that the settlement amount reflected the parties' meeting of the minds because: (1) the Commission concluded the testimony of a former adjuster of the insurance company that she knew for sure she did not settle the claim with plaintiff for $97,500 was not credible, and the Commission is the sole judge of the credibility of witnesses and the weight to be given their testimony; (2) defendants did not challenge the Commission's findings that neither the former adjuster nor defendant carrier produced any documentation to support the former adjuster's position that the settlement figure actually negotiated was in the range of $25,000 or that the $97,500 figure was a mistake; (3) defendants did not challenge the Commission's finding that after settlement negotiations between the parties that included demands as high as $145,000, the end result was the settlement figure of $97,500; and (4) defendant carrier's settlement attorney testified that the former adjuster communicated to her that the settlement amount was $97,500.

## 2. Workers' Compensation— clincher agreement—signature withheld by carrier and employer—enforceability

An agreement between plaintiff employee and defendant employer's workers' compensation insurance carrier to settle a claim for $97,500 was enforceable even though defendant carrier and defendant employer did not sign the settlement agreement where: (1) the carrier's adjuster contacted an attorney representing the employer and the carrier and requested that the attorney prepare a clincher agreement reflecting that the parties settled plaintiff's claim for $97,500; (2) the attorney sent a letter to plaintiff stating that she understood that a settlement had been reached in the amount of $97,500 and that she would prepare a clincher agreement embodying the parties' agreement to settle the claim for that amount once she received plaintiff's medical

records; (3) after the attorney received the medical records she forwarded to plaintiff, with a cover letter signed by her, a clincher agreement stating that the claim had been settled for $97,500; and (4) plaintiff signed the clincher agreement without modification. The letters signed by the settlement attorney, who was defendants' agent, and the clincher agreement signed by plaintiff together comprise a written memorialization of the fully executed settlement agreement that satisfied the signing requirement of Workers' Compensation Rule 502(3)(b).

**3. Workers' Compensation— compromise settlement agreement—filing by employee rather than by employer**

A compromise settlement agreement that was drafted by an attorney representing the compensation carrier and the employer and that was signed by the employee but not by the carrier and the employer was not unenforceable because the employee rather than the employer filed it with the Industrial Commission for enforcement. N.C.G.S. § 97-17(a).

**4. Workers' Compensation— settlement agreement—fair and just—best interests of parties**

The Industrial Commission did not err in a workers' compensation case by deeming that a compromise agreement settling plaintiff's knee injury claim for $97,500 was fair and just and in the best interest of all parties based on the evidence available to the parties at the time of the settlement negotiations.

**5. Workers' Compensation— attorney fees—bad faith**

The Industrial Commission did not abuse its discretion in a workers' compensation case by assessing attorney fees in the amount of 25% of the settlement amount of $97,500 against defendant carrier under N.C.G.S. § 97-88.1 because: (1) the position defendants took in the face of their settlement agreement with plaintiff was in bad faith; and (2) defendants have articulated no reasonable ground in support of their failure to honor the terms of the settlement agreement.

Appeal by defendants from Opinion and Award entered 7 February 2008 by the North Carolina Industrial Commission. Heard in the Court of Appeals 1 December 2008.

*The Jernigan Law Firm, by Leonard T. Jernigan, Jr., for plaintiff-appellee.*

*Hedrick, Gardner, Kincheloe & Garofalo, L.L.P., by J. A. Gardner, III, and M. Duane Jones, for defendants-appellants.*

MARTIN, Chief Judge.

Defendant-employer Red Simpson and defendant-carrier Liberty Mutual Insurance Company (collectively "defendants") appeal from an Opinion and Award of the North Carolina Industrial Commission ("Commission") approving a compromise settlement agreement and awarding attorney's fees and costs in favor of plaintiff-employee Scott Chaisson ("plaintiff"). We affirm.

The parties do not dispute that, on 21 February 2003, plaintiff sustained an injury to his right ankle and right knee arising out of and in the course of his employment as a crew foreman and utility lineman with defendant-employer. Defendant-employer is a power line contracting company, which "servic[es] power companies, utility companies around the United States." In the course of his employment with defendant-employer, plaintiff "would prepare and install underground power and overhead power, high voltage, low voltage and transmission lines all across the mid[-A]tlantic," which required plaintiff to "engage[] in strenuous activity, including climbing poles, walking lines and making repairs during ice storms."

At the time of his injury, plaintiff was in Tallmansville, West Virginia, working for defendant-employer to assess and repair power lines that had been damaged as a result of an ice storm in the area. While he was surveying miles of damaged power lines in a mountainous area covered by five to seven feet of snow, plaintiff walked down an embankment and fell into a concealed hole that was about five feet deep. When plaintiff fell into the hole, he "heard a pop noise, and [his] knee completely flipped to right around [his] shoulder area." Since his cellular telephone did not work due to the elevation in that area, plaintiff made his way out of the hole and "dragg[ed his] leg [behind him] actually to get back to the roadway for someone to pick [him] up," during which time he felt "a lot of burning in [his] knee."

Defendant-carrier accepted plaintiff's claim as a compensable injury. On 15 May 2003, plaintiff underwent arthroscopic surgery on his right knee to repair the right medial meniscal tear that was detected by an MRI on 13 March 2003. Plaintiff's treating physician

prescribed "a vigorous physical therapy rehabilitation program" following his surgery and released plaintiff to return to full duty work on 28 October 2003.

However, on 18 August 2004, plaintiff returned to his treating physician complaining that he continued to "hav[e] problems with his knee and . . . described a burning-type discomfort, particularly with activity, and squatting." After being ordered to start another course of physical therapy, plaintiff returned to his treating physician on 15 February 2005, who noted that plaintiff "had persistent pain in the knee cap (patellofemoral pain) and tendinitis (iliotibial friction band syndrome) on the outside of his knee." Plaintiff was again sent to participate in a physical therapy rehabilitation program and told to return for a reevaluation in three months. Plaintiff began physical therapy on 7 March 2005 and was to be seen twice a week for four to six weeks, where it was reported that plaintiff "had pain in his knee at rest and with activity, an abnormal gait, and decreased knee strength."

According to a later follow-up visit, the results of which are reflected in the Full Commission's unchallenged Finding of Fact 10, plaintiff's treating physician made the following determinations:

> Per the testimony of [plaintiff's treating physician,] Dr. Caudle, Plaintiff is likely to have persistent symptoms and over time he is likely to have wear-and-tear type arthritis, a wearing away of the cartilage on the bone, on the inside half of the knee, where the torn cartilage was removed. The meniscus cartilage is between the bones, and the articular cartilage is on the bone. The cartilage serves as a cushioning between the bones. As Dr. Caudle testified, Plaintiff is at risk of needing future medical treatment for his knee because he does not have enough normal cushion remaining in his knee. It is more likely than not that Plaintiff will have gradual worsening symptoms in his right knee as he ages.

The Full Commission also made the following unchallenged findings of fact:

> 5. In January 2004, Liberty Mutual sent Plaintiff a Form 21, which Plaintiff refused to sign. Plaintiff wrote the Industrial Commission saying he did not think the compensation was fair, particularly since he had lost his job because he could no longer perform the physical duties of his job.

. . . .

11. Candice Buchanan was a Senior Claims Case Manager II for Liberty Mutual in 2005, and was employed by Liberty Mutual from April 1998 until May 13, 2005 in Tampa, Florida. She now works in a similar capacity for another insurance company in Tampa.

12. As a Senior Claims Case Manager II she handled catastrophic claims, complicated litigation and anything that had a high dollar value. She tended to get more complicated claims or older claims. Because Ms. Buchanan had been able to settle a lot of cases quickly, the company started giving her more and more cases that needed to be settled that other people could not get settled, and she was able to do it. She handled and settled a high volume of claims, and because of this ability she was nicknamed "The Liquidator." If no other case manager could liquidate the file, it would be given to her.

13. Several adjusters had handled Plaintiff's file before Ms. Buchanan got it. Future medicals were an issue, no permanent disability benefits had been paid, and Plaintiff had refused to sign a Form 21 submitted to him previously by Liberty Mutual.

14. Ms. Buchanan first picked up the Plaintiff's file on April 6, 2005. Ms. Buchanan talked with Plaintiff on one day, on or about April 14, 2005, and they reached a settlement agreement. Ms. Buchanan could not testify as to the exact settlement amount, but thought it was in the range of $25,000. Per Plaintiff's testimony, the settlement amount agreed to was $97,500.

15. Even though his education level is only a G.E.D., Plaintiff presents himself as intelligent and articulate. Plaintiff's wife has a B.S. in nursing, and was able to assist her husband in researching issues of further medical treatment, including a possible knee replacement. During the settlement negotiations with Liberty Mutual, Plaintiff made settlement demands as high as $145,000. At one time, a figure of $85,000 was also discussed, although after researching the knee replacement issue, Plaintiff would not accept that amount. *The end result was the settlement figure of $97,500.*

16. After the settlement figure was reached between Plaintiff and Candice Buchanan, Ms. Buchanan contacted Hedrick Eatman Gardner and Kincheloe, defense counsel for Liberty

Mutual in North Carolina. The file was assigned to attorney Jennifer Ruiz for preparation of the settlement package, including the compromise settlement agreement. On April 28, 2005, Attorney Ruiz contacted Candice Buchanan by telephone, to determine the settlement amount. *In her handwritten notes of April 28, 2005, Ms. Ruiz recorded that she had spoken with Candice ("Candy") Buchanan and that the Scott Chaisson case had been settled for $97,500 and that Ms. Buchanan would email her the medical records.* Ms. Ruiz would draft the settlement agreement, and was not involved in the settlement negotiations.

. . . .

18. Jennifer Ruiz prepared a Compromise Settlement Agreement, per the direction of her client, Liberty Mutual. The Compromise Settlement Agreement was mailed to Plaintiff with a cover letter from Ms. Ruiz dated June 9, 2005. Ms[.] Ruiz requested that Plaintiff review and sign the agreement and return it to her office. After receiving the settlement agreement, which stated that the settlement amount was $97,500.00, to be paid in one lump sum, Plaintiff signed the agreement and returned it to Ms. Ruiz's office.

19. By the time the agreement had been signed by Plaintiff and returned to Liberty Mutual, Candice Buchanan had left her employment. Although the agreement had been negotiated by Ms. Buchanan as an agent of Liberty Mutual Insurance Company, Liberty Mutual refused to sign the agreement, and took the position that the settlement amount was a mistake.

20. In her testimony, Candice Buchanan acknowledged that a settlement agreement was reached. However, she denied that the amount was $97,500 and insisted that it was in the range of $25,000. *Ms. Buchanan produced no documentation to support her position that the settlement figure actually negotiated was in the range of $25,000 rather than the $97,500, which she communicated to Jennifer Ruiz. Liberty Mutual produced no records to substantiate their position that the $97,500 figure was a "mistake."*

. . . .

23. After Plaintiff learned that the carrier would not honor the Compromise Settlement Agreement, he sent the agreement to

the Executive Secretary's office for enforcement. By Order filed August 30, 2005, the Executive Secretary's office denied the motion to enforce, and referred the matter for a hearing before a Deputy Commissioner. Plaintiff hired attorney Leonard Jernigan to represent him at the hearing before the Deputy Commissioner, and Mr. Jernigan filed a Form 33 with cover letter dated September 14, 2005.

(Emphasis added.)

On 19 September 2005, defendants' attorney signed a Form 33R on behalf of defendants alleging that "[d]efendants never signed a settlement agreement and therefore a settlement in any amount cannot be enforced." On 4 April 2006, a deputy commissioner heard plaintiff's motion to "enforce an alleged settlement agreement." On 22 May 2007, the deputy commissioner filed an Opinion and Award, which concluded that the parties did negotiate and enter into a settlement agreement to which defendants were bound "under general principles of contract law," and that defendant-carrier's conduct "ha[d] been in bad faith." As a result, the deputy commissioner approved the compromise settlement agreement in the amount of $97,500, ordered defendant-carrier to pay attorney's fees, and ordered defendants to pay costs.

On 5 June 2007, defendants appealed to the Full Commission from the deputy commissioner's Opinion and Award. On 7 February 2008, the Full Commission entered its Opinion and Award, which affirmed the deputy commissioner's Opinion and Award with minor modifications. Defendants gave notice of appeal to this Court.

Our Supreme Court has "repeatedly held 'that our Workers' Compensation Act should be liberally construed to effectuate its purpose to provide compensation for injured employees or their dependents, and its benefits should not be denied by a technical, narrow, and strict construction.' " *Adams v. AVX Corp.*, 349 N.C. 676, 680, 509 S.E.2d 411, 413 (1998) (quoting *Hollman v. City of Raleigh*, 273 N.C. 240, 252, 159 S.E.2d 874, 882 (1968)), *reh'g denied*, 350 N.C. 108, 532 S.E.2d 522 (1999).

"The Industrial Commission and the appellate courts have distinct responsibilities when reviewing workers' compensation claims." *Billings v. Gen. Parts, Inc.*, 187 N.C. App. 580, 584, 654 S.E.2d 254, 257 (2007) (citing *Deese v. Champion Int'l Corp.*, 352 N.C. 109, 114, 530 S.E.2d 549, 552 (2000)), *disc. review and supersedeas denied*,

362 N.C. 233, 659 S.E.2d 435 (2008). The Industrial Commission is " 'the fact finding body,' " *Adams*, 349 N.C. at 680, 509 S.E.2d at 413 (quoting *Brewer v. Powers Trucking Co.*, 256 N.C. 175, 182, 123 S.E.2d 608, 613 (1962)), and is " 'the sole judge of the credibility of the witnesses and the weight to be given their testimony.' " *Id.* (quoting *Anderson v. Lincoln Constr. Co.*, 265 N.C. 431, 433-34, 144 S.E.2d 272, 274 (1965)). As such, "[t]he Commission is not required to accept the testimony of a witness, even if the testimony is uncontradicted." *Hassell v. Onslow Cty. Bd. of Educ.*, 362 N.C. 299, 307, 661 S.E.2d 709, 715 (2008); *see also Anderson v. Nw. Motor Co.*, 233 N.C. 372, 376, 64 S.E.2d 265, 268 (1951) ("[The Commission] may accept or reject the testimony of a witness, either in whole or in part, depending solely upon whether it believes or disbelieves the same.").

On the other hand, "appellate courts must examine [only] 'whether *any* competent evidence supports the Commission's findings of fact and whether [those] findings . . . support the Commission's conclusions of law.' " *McRae v. Toastmaster, Inc.*, 358 N.C. 488, 496, 597 S.E.2d 695, 700 (2004) (emphasis added) (second alteration and omission in original) (quoting *Deese*, 352 N.C. at 116, 530 S.E.2d at 553). If the findings of fact are supported by competent evidence, those findings are conclusive on appeal " 'even though there be evidence that would support findings to the contrary.' " *See Adams*, 349 N.C. at 681, 509 S.E.2d at 414 (quoting *Jones v. Myrtle Desk Co.*, 264 N.C. 401, 402, 141 S.E.2d 632, 633 (1965)). Moreover, findings of fact which are left unchallenged by the parties on appeal are "presumed to be supported by competent evidence" and are, thus "conclusively established on appeal." *See Johnson v. Herbie's Place*, 157 N.C. App. 168, 180, 579 S.E.2d 110, 118 (internal quotation marks omitted), *disc. review denied*, 357 N.C. 460, 585 S.E.2d 760 (2003). Only "[t]he Commission's conclusions of law are reviewed *de novo*." *McRae*, 358 N.C. at 496, 597 S.E.2d at 701.

I.

[1] Defendants first contend there is no competent evidence to support the Commission's Finding of Fact 21, which found that the parties negotiated a settlement agreement in the amount of $97,500, and that the settlement amount reflected the parties' "meeting of the minds." We disagree.

"It is a well-settled principle of contract law that a valid contract exists only where there has been a meeting of the minds as to all essential terms of the agreement." *Northington v. Michelotti*, 121

N.C. App. 180, 184, 464 S.E.2d 711, 714 (1995) (citing *O'Grady v. Bank*, 296 N.C. 212, 221, 250 S.E.2d 587, 594 (1978)); *see also Charles Holmes Mach. Co. v. Chalkley*, 143 N.C. 181, 183, 55 S.E. 524, 525 (1906) ("The first and most essential element of an agreement is the consent of the parties, an *aggregatio mentium*, or meeting of two minds in one and the same intention, and until the moment arrives when the minds of the parties are thus drawn together, the contract is not complete, so as to be legally enforceable."). "There must be neither doubt nor difference between the parties[; t]hey must assent to the same thing in the same sense, and their minds must meet as to all the terms." *Croom v. Goldsboro Lumber Co.*, 182 N.C. 217, 220, 108 S.E. 735, 737 (1921). "This mutual assent and the effectuation of the parties' intent is normally accomplished through the mechanism of offer and acceptance." *Snyder v. Freeman*, 300 N.C. 204, 218, 266 S.E.2d 593, 602 (1980). "Whether mutual assent is established and whether a contract was intended between parties are questions for the trier of fact." *Id.* at 217, 266 S.E.2d at 602.

The Commission's Finding of Fact 21 reads as follows:

Considering all of the evidence, the testimony of Candice Buchanan that the settlement amount was less than $97,500 is not credible. The Plaintiff's testimony that the parties had negotiated a settlement of $97,500 is supported by the greater weight of the evidence and is found to be credible. [Defendant-carrier] Liberty Mutual through their agent, Candice Buchanan, who was authorized to act on the [defendant-]carrier's behalf, negotiated a settlement with Plaintiff in the amount of $97,500. This meeting of the minds was communicated to their attorney and agent Jennifer Ruiz and was reflected in documents prepared by Ms. Ruiz as the attorney and agent for the Defendants, in her letter of May 25, 2005, her cover letter of June 9, 2005, and the settlement agreement itself.

We first note that we cannot conclude the Commission erred when it found Ms. Buchanan's testimony that she "kn[e]w for sure" she did not settle the claim with plaintiff for $97,500 was not credible, since the Commission is " 'the sole judge of the credibility of the witnesses and the weight to be given their testimony.' " *See Adams*, 349 N.C. at 680, 509 S.E.2d at 413 (quoting *Anderson*, 265 N.C. at 433-34, 144 S.E.2d at 274). Secondly, defendants did not challenge the Commission's findings that neither Ms. Buchanan nor defendant-carrier produced any documentation to support Ms. Buchanan's posi-

tion that "the settlement figure actually negotiated was in the range of $25,000, rather than $97,500," or that the $97,500 figure was a "mistake." Defendants also did not challenge the Commission's finding that, after settlement negotiations between plaintiff and defendant-carrier that included "demands as high as $145,000," "[t]he end result [of the settlement negotiations] was the settlement figure of $97,500." (Emphasis added.)

Additionally, according to Ms. Ruiz's testimony, Ms. Buchanan communicated to her that the settlement amount was $97,500. In support of her testimony, Ms. Ruiz produced her own handwritten notes taken during her telephone conversation with Ms. Buchanan in which Ms. Ruiz documented that she had spoken with Candice ("Candy") Buchanan who told her that plaintiff's case had been "settled for $97,500." The parties also stipulated that a letter was written and signed by Ms. Ruiz, dated 25 May 2005, and sent to plaintiff in which she wrote:

> As you know, I represent the [d]efendants in the above-referenced workers' compensation claim [for I.C. File No. 332868, Carrier File No. WC555-683956, and HEGK File No. 19R-1090]. *I understand that a settlement has been reached in the amount of $97,500.00.* The settlement proceeds cannot be paid until a fully executed Settlement Agreement has been approved by the North Carolina Industrial Commission. I cannot draft the Settlement Agreement until I have a complete copy of your medical records.
>
> I understand that you will be providing me with a copy of your medical records. . . . If it would be more convenient for you, I could certainly have our office courier pick up the documents.

(Emphasis added.) The parties further stipulated that, along with a signed letter from Ms. Ruiz dated 9 June 2005, plaintiff received an unsigned copy of the Agreement for Final Compromise Settlement and Release prepared by Ms. Ruiz, which included the following paragraph:

> Notwithstanding the controversy between the parties, [plaintiff] has agreed to accept, and [d]efendants have agreed to pay, the sum of NINETY-SEVEN THOUSAND FIVE HUNDRED AND 00/100 DOLLARS ($97,500.00), in one lump sum, without commutation, plus payment of all medical bills and expenses, as per Rule 502(2)(a), incurred for treatment of the injury of February 21,

2003, up to and including the date of this Agreement, and no further, after said medical bills have been submitted to and approved by the North Carolina Industrial Commission.

Moreover, the letter from Ms. Ruiz to plaintiff accompanying the compromise settlement agreement stated: "Please find enclosed the *Agreement for Compromise Settlement and Release* ('clincher agreement') which I have drafted in accordance with the agreement you have reached with Red Simpson, Inc. and Liberty Mutual Insurance Company to settle your workers' compensation claim."

Based on the evidence in the record and the unchallenged findings of fact by which we are bound, we conclude that there was competent evidence to support the Commission's finding that a settlement agreement was reached in the amount of $97,500. Therefore, we hold that the Commission did not err by determining that there had been a meeting of the minds between plaintiff and defendants, through defendant-carrier's agent Ms. Buchanan, as to the settlement amount of $97,500. Accordingly, we overrule this assignment of error.

II.

[2] Defendants next contend the Commission erred by considering the parties' compromise settlement agreement because the agreement did not strictly comply with the requirements of Workers' Compensation Rule 502(3)(b). We disagree.

"To make its purpose that the North Carolina Workmen's Compensation Act shall be administered exclusively by the North Carolina Industrial Commission effective, the General Assembly has empowered the said Industrial Commission to make rules, not inconsistent with this act, for carrying out the provisions of the act . . . ." *Winslow v. Carolina Conf. Ass'n*, 211 N.C. 571, 579, 191 S.E. 403, 408 (1937) (internal quotation marks omitted). The North Carolina Industrial Commission also has the power "to construe and apply such rules[, the construction and application of which] . . . ordinarily are final and conclusive and not subject to review by the courts of this State on an appeal from an award made by said Industrial Commission." *Id.* at 579-80, 191 S.E. at 408.

Furthermore, the Commission has the discretion under Rule 801 of the Workers' Compensation Rules of the North Carolina Industrial Commission to waive violations of its own rules in the interest of justice, *see Wade v. Carolina Brush Mfg. Co.*, 187 N.C. App. 245, 251, 652

S.E.2d 713, 717 (2007), but only "where such action does not controvert the provisions of the statute." *See Hyatt v. Waverly Mills*, 56 N.C. App. 14, 25, 286 S.E.2d 837, 843 (1982).

Workers' Compensation Rule 801 provides:

> In the interest of justice, these rules may be waived by the Industrial Commission. The rights of any unrepresented plaintiff will be given special consideration in this regard, to the end that *a plaintiff without an attorney shall not be prejudiced by mere failure to strictly comply with any one of these rules.*

Workers' Comp. R. of N.C. Indus. Comm'n 801 2009 Ann. R. (N.C.) 1009 (emphasis added). This Court has stated that "[i]t should be clearly understood that the Commission does have the discretion to apply Rule 801 in cases where a *pro se* litigant fails to *strictly* comply with the rules." *Wade*, 187 N.C. App. at 251, 652 S.E.2d at 717; *see also id.* ("Had the plaintiff filed a defective Form 44 or other document setting forth the grounds for appeal, even if inexpertly drawn, the Commission could have applied Rule 801 to waive strict compliance."). Consequently, when the Commission properly exercises its discretion to waive strict compliance with those rules which do not conflict with the Workers' Compensation Act, such decisions are "not reviewable by the courts, absent a showing of manifest abuse of that discretion." *See Hyatt*, 56 N.C. App. at 25, 286 S.E.2d at 843-44; *see also White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985) (stating that a decision subject to an abuse of discretion standard of review must be "accorded great deference" and may be reversed "only upon a showing that its actions are manifestly unsupported by reason . . . [and] only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision.").

"A 'clincher' or compromise agreement is a form of voluntary settlement" recognized by the Commission and used to finally resolve contested or disputed workers' compensation cases. *See Ledford v. Asheville Hous. Auth.*, 125 N.C. App. 597, 599, 482 S.E.2d 544, 546, *disc. review denied*, 346 N.C. 280, 487 S.E.2d 550 (1997). According to Workers' Compensation Rule 502: "All compromise settlement agreements must be submitted to the Industrial Commission for approval. Only those agreements deemed fair and just and in the best interest of all parties will be approved." Workers' Comp. R. of N.C. Indus. Comm'n 502(1) 2009 Ann. R. (N.C.) 996. Additionally, in order for the settlement agreement to be eligible for approval by the Commission, the settlement agreement or "clincher" must contain

certain specified or "equivalent" language that complies with the requirements identified in subsections (a) through (h) of Rule 502(2). *See* Workers' Comp. R. of N.C. Indus. Comm'n 502(2) 2009 Ann. R. (N.C.) 996-97. Further, Rule 502(3) provides that "[n]o compromise agreement will be considered [by the Commission] unless" certain specified "additional requirements are met," which include the provision that "[t]he parties and all attorneys of record must have signed the agreement." Workers' Comp. R. of N.C. Indus. Comm'n 502(3)(b) 2009 Ann. R. (N.C.) 997.

It has been long held that "[c]ompromise agreements are governed by the legal principles applicable to contracts generally," *Penn Dixie Lines, Inc. v. Grannick*, 238 N.C. 552, 556, 78 S.E.2d 410, 414 (1953), which include the central principle that, "[i]n the formation of a contract[,] an offer and an acceptance are essential elements; they constitute the agreement of the parties. The offer must be communicated, must be complete, and must be accepted in its exact terms." *Dodds v. St. Louis Union Tr. Co.*, 205 N.C. 153, 156, 170 S.E. 652, 653 (1933). Moreover, this acceptance, by "promise or act, and communication thereof when necessary, while an offer of a promise is in force, changes the character of the offer. It supplies the elements of agreement and consideration, changing the offer into a binding promise, and the offer cannot afterwards be revoked without the acceptor's consent." *Wilkins v. Vass Cotton Mills*, 176 N.C. 72, 81, 97 S.E. 151, 155 (1918) (internal quotation marks omitted).

Furthermore, it has long been recognized that "[a] valid contract . . . may consist of one or many pieces of paper, provided the several pieces are so connected physically or by internal reference that there can be no uncertainty as to the meaning and effect when taken together." *Simpson v. Beaufort Cty. Lumber Co.*, 193 N.C. 454, 455, 137 S.E. 311, 312 (1927) (internal quotation marks omitted); *see also Rankin v. Mitchem*, 141 N.C. 277, 280, 53 S.E. 854, 855 (1906) ("Letters and telegrams which constitute an offer and acceptance of a proposition, complete in its terms, may constitute a binding contract, although there is an understanding that the agreement must be expressed in a formal writing, and one of the parties afterwards refuses to sign such agreement without material modification.") (internal quotation marks omitted).

In *Lemly v. Colvard Oil Co.*, 157 N.C. App. 99, 577 S.E.2d 712 (2003), this Court determined that a handwritten memorandum, signed by the parties following a Commission-ordered mediated settlement conference was "a valid compromise settlement agreement

subject to approval by the Industrial Commission pursuant to Rule 502(1)," after one party drafted a clincher agreement according to the terms agreed upon in the settlement conference but the non-drafting party refused to sign the agreement. *See Lemly,* 157 N.C. App. at 101, 104, 577 S.E.2d at 714, 716. The handwritten memorandum at issue in *Lemly* stated that (1) a definite settlement amount was to be payable by defendants to claimant, (2) claimant would "execute [a] clincher setting out above terms and other standard language," and (3) "[u]pon approval by [the Industrial Commission], settlement will be paid." *See id.* at 100-01, 577 S.E.2d at 713 (third alteration in original). Although, at the time of the settlement negotiations in the present case, the parties were not participating in a mediated settlement conference, we nevertheless find *Lemly* instructive.

In *Lemly,* the Commission found that the parties had reached an agreement following their mediation settlement conference and signed a settlement memo "pending the execution by plaintiff of a clincher agreement." *See id.* at 102, 577 S.E.2d at 714 (internal quotation marks omitted). This was also reflected in the mediator's report from the parties' settlement conference, which stated that the parties reached "agreement on all issues" and that the issues settled would be "disposed of" by the clincher. *Id.* at 104, 577 S.E.2d at 715. The Court also recognized that, one day after the parties signed the handwritten settlement memo, defendants sent plaintiff a clincher agreement "contain[ing] the standard terms required by Rule 502(2)," but plaintiff did not sign it. *See id.* at 103-04, 577 S.E.2d at 715. The Court further stated: "Defendants argue[d] that the plaintiff ha[d] not alleged that the clincher agreement contained terms different than what was agreed to at the mediation. We agree." *Id.* at 101, 577 S.E.2d at 714.

In the present case, as in *Lemly,* the Commission found that, on or about 14 April 2005, plaintiff and defendant-carrier's agent, Ms. Buchanan, "reached a settlement agreement." Again, this finding was not challenged by defendants and is, therefore, binding on this Court. Additionally, defendants do not dispute that a letter dated 25 May 2005 was signed by their agent, Ms. Ruiz, and sent to plaintiff which stated, "I understand that a settlement has been reached in the amount of $97,500.00." Thus, as in *Lemly,* defendants in the present case signed a letter memorializing their offer to settle plaintiff's workers' compensation claim for the definite amount of $97,500, pending the execution of a clincher agreement to be drafted by Ms. Ruiz upon receipt of plaintiff's medical records.

CHAISSON v. SIMPSON

[195 N.C. App. 463 (2009)]

The parties in this case further stipulated that a settlement agreement was prepared by Ms. Ruiz and sent to plaintiff, which stated: "Notwithstanding the controversy between the parties, [plaintiff] has agreed to accept, and [d]efendants have agreed to pay, the sum of NINETY-SEVEN THOUSAND FIVE HUNDRED AND 00/100 DOLLARS ($97,500.00), in one lump sum . . . ." In the signed letter, dated 9 June 2005, accompanying the settlement agreement, Ms. Ruiz wrote:

Please find enclosed the *Agreement for Compromise Settlement and Release* ("clincher agreement") *which I have drafted in accordance with the agreement you have reached with Red Simpson, Inc. and Liberty Mutual Insurance Company to settle your workers' compensation claim.*

I would ask that you review this clincher agreement, sign where indicated, have your signature witnessed, and return it to me in the enclosed, self-addressed, stamped envelope. Upon receipt, I will sign the same on behalf of my clients and submit it to the North Carolina Industrial Commission for approval. The North Carolina Industrial Commission will review our agreement at that time to make sure that it is fair to all parties involved. After reviewing the agreement, the Commission will enter an Order, approving our settlement, and payment will be made to you in accordance with the agreement.

. . . .

Following the brief medical summary [included in the first several paragraphs of the clincher agreement], there are several paragraphs which state the positions of both you and, in the alternative, my clients with regard to your claim and any workers' compensation benefits allegedly owed to you by my clients. Please understand that these "contentions" paragraphs are not facts and should not be considered as such by you in reviewing the agreement. Following these paragraphs, there are several paragraphs which more fully set out in legal terms the settlement and release agreement. *These provide, among other things, the amount of settlement and indicate that this is a final settlement of your workers' compensation claim.*

. . . .

By copy of this letter to my clients, I am also asking that they review the enclosed clincher agreement and documentation/reports to be sure that they accurately and completely reflect

the terms of the settlement agreement reached between the parties. . . .

(Second and third emphasis added.) The parties further stipulated that, unlike the plaintiff in *Lemly*, the plaintiff in this case accepted all of the terms of the agreement by affixing his signature and that of his witness to the agreement, and returned the signed agreement to Ms. Ruiz as she requested.

Neither of the parties in the present case allege that the clincher agreement, prepared by defendants' agent and signed by plaintiff without any modifications, failed to comply with any of the requirements of 502(2), which are required for the agreement to be eligible for approval by the Commission. Instead, defendants assert only that this Court should conclude the Commission erred by considering the settlement agreement since, due to defendants' decision to withhold their signatures from the unmodified clincher agreement, which they drafted, the agreement failed to strictly comply with the signature requirement of Rule 502(3)(b).

However, we conclude that the 25 May and 9 June 2005 letters written and *signed by defendants' agent Ms. Ruiz*—which specifically stated that a settlement had been reached in the amount of $97,500 and that a clincher agreement stating the same followed— and the clincher agreement *signed by plaintiff*—which was prepared by defendants' agent reflecting the same terms—taken *together* comprise a written memorialization of the fully executed settlement agreement between plaintiff and defendants. Accordingly, since settlement agreements are subject to general contracting principles, we find that, in this case, the aforementioned documents taken together satisfied the signing requirement of Rule 502(3)(b), even though only defendants' agent signed the agreement on behalf of all defendants. *See, e.g., Pee Dee Oil Co. v. Quality Oil Co., Inc.*, 80 N.C. App. 219, 223, 341 S.E.2d 113, 115 ("That defendant company did not sign the asset purchase contract, which was prepared at its direction, is not decisive, *for a written contract can consist of several writings*.") (emphasis added) (citing *Hines v. Tripp*, 263 N.C. 470, 139 S.E.2d 545 (1965)), *disc. review denied*, 317 N.C. 706, 347 S.E.2d 438 (1986). Therefore, we hold that the Commission did not err or abuse its discretion when it waived strict compliance with Rule 502(3)(b) and considered the settlement agreement that it received from plaintiff, who was unrepresented by counsel at the time. Consequently, we overrule this assignment of error.

CHAISSON v. SIMPSON

[195 N.C. App. 463 (2009)]

III.

[3] Defendants next contend the settlement agreement was not approved by the Commission "in accordance with the statutory requirements" of N.C.G.S. § 97-17(a). In the present case, after plaintiff learned that defendants would "not honor" the compromise settlement agreement that defendants drafted and that he accepted without modifications, this then-*pro se* plaintiff "sent the agreement to the Executive Secretary's office [at the Commission] for enforcement." Defendants argue that, because plaintiff's decision to submit a copy of the settlement agreement directly to the Commission failed to comply with the express language of N.C.G.S. § 97-17(a), which provides that "[a] copy of a settlement agreement *shall be filed by the employer*," *see* N.C. Gen. Stat. § 97-17(a) (2007) (emphasis added), the "system envisioned" by the North Carolina General Assembly to "safeguard" the "processing and handling of compromise settlement agreements" was, itself, compromised. For the reasons discussed below, we overrule this assignment of error.

It has long been held that, "[i]f the language of the statute is plain and free from ambiguity, and expresses a single, definite, and sensible meaning, that meaning is conclusively presumed to be the meaning which the Legislature intended to convey. In other words, the statute must be interpreted literally." *Sch. Comm'rs of Charlotte v. Bd. of Aldermen of Charlotte*, 158 N.C. 191, 196, 73 S.E. 905, 908 (1912). However, it has also long been the rule that a statute must be "interpreted as a whole and in such case it is the accepted principle of statutory construction that every part of the law shall be given effect if this can be done by any fair and reasonable intendment." *State v. Barksdale*, 181 N.C. 621, 625, 107 S.E. 505, 507 (1921). "[I]t is further and fully established that where a literal interpretation of the language of a statute will lead to absurd results, or contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof shall be disregarded." *Id.*

N.C.G.S. § 97-17(a) provides:

This article does not prevent settlements made by and between the employee and employer so long as the amount of compensation and the time and manner of payment are in accordance with the provisions of this Article. *A copy of a settlement agreement shall be filed by the employer with and approved by the Commission.* No party to any agreement for compensation approved

by the Commission shall deny the truth of the matters contained in the settlement agreement, unless the party is able to show to the satisfaction of the Commission that there has been error due to fraud, misrepresentation, undue influence or mutual mistake, in which event the Commission may set aside the agreement. Except as provided in this subsection, the decision of the Commission to approve a settlement agreement is final and is not subject to review or collateral attack.

N.C. Gen. Stat. §97-17(a) (emphasis added). N.C.G.S. § 97-17(b) further provides that "[t]he *Commission shall not approve a settlement agreement* under this section, *unless all of the following conditions* are satisfied," which include the requirements that: (1) "[t]he settlement agreement is deemed by the Commission to be fair and just, and that the interests of all of the parties and of any person, including a health benefit plan that paid medical expenses of the employee have been considered"; (2) "[t]he settlement agreement contains a list of all of the known medical expenses of the employee related to the injury to the date of the settlement agreement, including medical expenses that the employer or carrier disputes . . .," unless "the employer agrees to pay all medical expenses of the employee related to the injury to the date of the settlement agreement"; and (3) "[t]he settlement agreement contains a finding that the positions of all of the parties to the agreement are reasonable as to the payment of medical expenses." N.C. Gen. Stat. §97-17(b) (emphasis added).

We agree that there seems to be no ambiguity in the sentence of subsection (a) of N.C.G.S. § 97-17, which provides that "[a] copy of a settlement agreement shall be filed by the employer with and approved by the Commission." N.C. Gen. Stat. §97-17(a). However, subsection (b) of the same statutory provision casts some doubt on how to construe this language, since subsection (b) plainly states that the Commission has the authority to approve a settlement agreement under this section *only* when "*all of the following conditions* are satisfied"—none of which is the condition that the settlement agreement must be submitted for filing to the Commission by the employer, rather than by the claimant. *See* N.C. Gen. Stat. §97-17(b) (emphasis added).

Furthermore, defendants cite no authority to support their assertion that the "public policy" the General Assembly has "set forth in G.S. 97-17 is that [d]efendants are the last to look at compromise settlement agreements . . . [to] ensure they were not altered before

sending them to the Industrial Commission for consideration and that they comply with the current expectations of the employer/carrier." Defendants also do not explain why this "policy" would be compromised by allowing this plaintiff, in these circumstances, to file this settlement agreement with the Commission. Instead, defendants only argue that, by the General Assembly requiring "the employer" rather than the claimant to file the settlement agreement with the Commission, it "assures [sic] that [defendants] have the last opportunity to ensure that same [sic] is compliant with their authority and their assessment of the claim" "[s]ince the carrier is making the payment."

Defendants' argument is unpersuasive. Defendants presented no evidence to show that they were deprived of the opportunity to thoroughly review the content of *their own* contract, prepared by *their agent*, to verify that the terms were consistent with their assessment of the value of plaintiff's claim prior to sending it to plaintiff for his acceptance, and presented no evidence that plaintiff altered the settlement agreement in any way prior to filing it with the Commission.

The facts of the present case are as follows: (1) an agreement had been reached between plaintiff and defendants, through its authorized agent, to settle plaintiff's worker's compensation claim in its entirety for a definite settlement amount; (2) defendants drafted a settlement agreement according to the terms of this negotiated agreement between plaintiff and defendants' agent; (3) there was competent evidence that plaintiff and defendants agreed on the terms that were reduced to writing in this settlement agreement; (4) plaintiff timely accepted the terms of the written settlement agreement without any modifications thereto; (5) there was no evidence of any change in circumstances that would tend to negate the negotiated settlement figure of the agreement between the time plaintiff signed the agreement and the time it was returned to defendants for their signatures; (6) there were no unknown facts which came to light that would impact the defendants' ability to enter into the agreement; and (7) defendants failed to show any justification for their failure to follow through with the settlement agreement negotiated.

As referenced above, our appellate courts "have held in decision after decision that our Workmen's Compensation Act *should be liberally construed to effectuate its purpose* to provide compensation for injured employees or their dependents, and its benefits should not be denied by a technical, narrow, and strict construction." *Hollman*, 273 N.C. at 252, 159 S.E.2d at 882 (emphasis added). Accordingly,

since the General Assembly has not expressly provided that a settlement agreement filed by the claimant, rather than by the employer, deprives the Commission of its authority to approve a settlement agreement otherwise properly before it, in light of the facts of the case before us, we hold that the compromise settlement agreement approved by the Commission is not unenforceable solely because it was filed by plaintiff, rather than by defendants. Therefore, we overrule this assignment of error.

IV.

[4] Defendants next contend the Commission erred when it deemed that the settlement agreement was "fair and just and in the best interest of all parties." We disagree.

"The law permits compromise settlements between employers and employees who are bound by and subject to the Workmen's Compensation Act, provided they are submitted to and approved by the Industrial Commission." *Caudill v. Chatham Mfg. Co.*, 258 N.C. 99, 106, 128 S.E.2d 128, 133 (1962). Both Workers' Compensation Rule 502(1) and N.C.G.S. § 97-17(b)(1) provide that the Commission may only approve those compromise settlement agreements that it deems to be "fair and just" and in the best interests of all of the parties. *See* Workers' Comp. R. of N.C. Indus. Comm'n 502(1) 2009 Ann. R. (N.C.) 996; N.C. Gen. Stat. § 97-17(b)(1). "The conclusion the agreement is fair and just . . . must come after a full review of the medical records filed with the agreement submitted to the Commission[, and] . . . only if [the agreement] allows the injured employee to receive the most favorable disability benefits to which he is entitled." *Lewis v. Craven Reg'l Med. Ctr.*, 134 N.C. App. 438, 441, 518 S.E.2d 1, 3 (1999), *aff'd per curiam*, 352 N.C. 668, 535 S.E.2d 33 (2000). "The law thus undertakes *to protect the rights of the employee* in contracting with respect to his injuries." *Caudill*, 258 N.C. at 106, 128 S.E.2d at 133 (emphasis added).

Here, although the parties stipulated that the cost of a total knee replacement is approximately $25,000 to $30,000, defendants argue that, at the time of the "alleged date of settlement" on 14 April 2005, there was "no indication" in plaintiff's medical history that he would require a total knee replacement, and so there was "no competent evidence, such as a medical note, to support the $97,500 settlement figure at the time the settlement was reached on or around April 14, 2005." However, defendants did not challenge the Commission's findings that "[f]uture medicals *were an issue*, no

permanent disability benefits had been paid, and [p]laintiff had refused to sign a Form 21 submitted to him previously by [defendant-carrier]." (Emphasis added.)

Furthermore, defendants did not dispute, and the medical records support, the Commission's finding that plaintiff suffered from a 10% permanent partial disability rating to his right knee, and that, although plaintiff's treating physician first determined that he had reached maximum medical improvement in October 2003, his physician withdrew this opinion after he reassessed plaintiff's condition in October 2004. Additionally, at a 15 February 2005 follow-up visit with plaintiff, plaintiff's treating physician noted that plaintiff had "[p]ersistent knee pain" dating back to the arthroscopic surgery on plaintiff's right knee almost two years earlier, and noted that he planned to see plaintiff in three months to "reevaluate" his condition, but would see him "[a]nytime sooner if [plaintiff wa]s having problems." The medical records also support the Commission's finding that, during plaintiff's third prescribed course of physical therapy beginning in March 2005, plaintiff reported continued knee pain "at rest and with activity," and had an "abnormal gait," as well as "decreased knee strength."

Since defendants chose to give plaintiff's file to Ms. Buchanan one month before plaintiff was due to return to his physician for a reevaluation of his condition in May 2005, and Ms. Buchanan was relied upon to settle a lot of cases *quickly* and could settle "cases that needed to be settled" that other people could not settle, it seems "clear that the parties were contracting [to settle plaintiff's claim] with reference to future uncertainties and were taking their chances as to future developments, relapses and complications, or lack thereof." *See Caudill*, 258 N.C. at 106, 128 S.E.2d at 133; *see also id.* ("A compromise is essentially an adjustment and settlement of differences. If there are no differences or uncertainties there is no reason for compromise."). Therefore, we hold that, based on the evidence available to the parties at the time of the settlement negotiation, the Commission correctly concluded that the parties' decision to settle plaintiff's claim for $97,500 was fair and just and in the best interest of the parties, and overrule this assignment of error.

V.

[5] Finally, defendants contend the Commission abused its discretion when it assessed attorney's fees in the amount of 25% of the settlement amount of $97,500 against defendant-carrier pursuant to

N.C.G.S. § 97-88.1. "[T]he policy behind North Carolina's Workers' Compensation Act . . . [is] to provide a swift and certain remedy to an injured worker and to ensure a limited and determinate liability for employers." *Matthews v. Charlotte-Mecklenburg Hosp. Auth.*, 132 N.C. App. 11, 16-17, 510 S.E.2d 388, 393, *disc. review denied*, 350 N.C. 834, 538 S.E.2d 197 (1999). In furtherance of this purpose, the General Assembly enacted N.C.G.S. § 97-88.1, which provides:

> If the Industrial Commission shall determine that any hearing has been brought, prosecuted, or defended without reasonable ground, it may assess the whole cost of the proceedings including reasonable fees for defendant's attorney or plaintiff's attorney upon the party who has brought or defended them.

N.C. Gen. Stat. § 97-88.1 (2007). "The purpose of th[is] section is to prevent stubborn, unfounded litigiousness, which is inharmonious with the primary purpose of the Workers Compensation Act to provide compensation to injured employees." *Beam v. Floyd's Creek Baptist Church*, 99 N.C. App. 767, 768, 394 S.E.2d 191, 192 (1990) (internal quotation marks omitted).

The determination of "[w]hether the defendant had a reasonable ground to bring a hearing is reviewable by this Court *de novo*." *Troutman v. White & Simpson, Inc.*, 121 N.C. App. 48, 50, 464 S.E.2d 481, 484 (1995), *disc. review denied*, 343 N.C. 516, 472 S.E.2d 26 (1996). "The reviewing court must look to the evidence introduced at the hearing in order to determine whether a hearing has been defended without reasonable ground." *Ruggery v. N.C. Dep't of Corr.*, 135 N.C. App. 270, 274, 520 S.E.2d 77, 80 (1999). "The test is not whether the defense prevails, but whether it is based in reason rather than in stubborn, unfounded litigiousness." *Sparks v. Mountain Breeze Rest. & Fish House, Inc.*, 55 N.C. App. 663, 665, 286 S.E.2d 575, 576 (1982). If it is determined that a party lacked reasonable grounds to bring or defend a hearing before the Commission, then the decision of whether to make an award pursuant to N.C.G.S. § 97-88.1, "and the amount of the award, is in the discretion of the Commission, and its award or denial of an award will not be disturbed absent an abuse of discretion." *Troutman*, 121 N.C. App. at 54-55, 464 S.E.2d at 486.

Defendants argue that they had "a reasonable basis to defend th[eir] claim" that the settlement agreement submitted to the Commission by plaintiff was unenforceable, primarily because they denied that the settlement amount agreed to by both parties was

$97,500. However, in light of the evidence before the Commission discussed in the sections above, we conclude that the position defendants took in the face of their settlement agreement with plaintiff was in bad faith, as found by the Commission, and conclude that defendants have articulated no reasonable ground in support of their failure to honor the terms of this settlement agreement with plaintiff. Accordingly, we hold that the Commission did not abuse its discretion when it assessed a percentage of the settlement amount of $97,500 as attorney's fees against defendant-carrier in its 7 February 2008 Opinion and Award.

Affirmed.

Judges WYNN and STEPHENS concur.